UNITED STATES of America, Appellee,

v.

SISSETON–WAHPETON SIOUX TRIBE, Appellant.

SISSETON–WAHPETON SIOUX TRIBE, Appellant,

v.

UNITED STATES DEPARTMENT OF JUSTICE and Richard Thornburgh, in his capacity as Attorney General of the United States, Appellees.

No. 89–5426.

United States Court of Appeals, Eighth Circuit.

Submitted Oct. 11, 1989.

Decided March 2, 1990.

Bertram E. Hirsch, Floral Park, N.Y., for appellant.

Philip N. Hogen, Sioux Falls, S.D., for appellees.

Before JOHN R. GIBSON, MAGILL and BEAM, Circuit Judges.

JOHN R. GIBSON, Circuit Judge.

In the Indian Gaming Regulatory Act, 25 U.S.C.A. §§ 2701–2721 (West Supp.1989), Congress utilizes differing degrees of federal, state, and tribal involvement to regulate gaming conducted on Indian lands. The Act seeks to shield these gaming operations from organized crime and other corrupting influences. On appeal, the Sisseton–Wahpeton Sioux Tribe argues that its blackjack enterprise need not comply with South Dakota law on wager limits and other gaming requirements because it is covered by a grandfather provision of the Act, 25 U.S.C.A. § 2703(7)(C), which exempts the gaming from State regulation. The district court rejected this argument and held that the Tribe's blackjack operation on tribal lands violated the Act. 718 F.Supp. 755 (D.S.D.1989). We reverse and remand to the district court to enter a declaratory judgment consistent with this opinion.

The Tribe opened a blackjack gaming enterprise on its South Dakota reservation on April 15, 1988. The game is owned and operated by the Tribe pursuant to tribal ordinance, but forty percent of the venture's net income is paid to a California enterprise which provided the start-up funding.[1] On the same day that the blackjack game opened, the Tribe filed a complaint in district court seeking a declaration of its legal right to operate the blackjack enterprise and asking the court to enjoin the United States Department of Justice and the United States Attorney General from interfering with its gaming operations. The United States then filed a complaint seeking a declaration that the blackjack game violated federal law and requesting that the Tribe be enjoined from operating the game. The district court consolidated the two actions.

This appeal requires that we interpret the Indian Gaming Regulatory Act, Pub.L. No. 100–497, 102 Stat. 2467–86 (codified at 25 U.S.C.A. §§ 2701–2721), enacted by Congress in October, 1988, soon after the parties filed their complaints. The Act was vigorously debated prior to enactment, and Congress declared the Act's purpose to be threefold: (1) to provide a statutory foundation for Indian gaming operations as a means of promoting tribal economic development and strong tribal government; (2) to prevent the infiltration of such gaming by organized crime and other corrupting influences; and (3) to establish independent federal standards and the National Indian Gaming Commission to regulate such gaming. 25 U.S.C.A. § 2702.

The Act creates three classes of gaming which differ in the degree of federal, state, and tribal oversight. Class I gaming con-

---

1. The Act provides that:
   Upon the request of an Indian tribe, the Chairman [of the National Indian Gaming Commission] may approve a management contract providing for a fee based upon a percentage of the net revenues of a tribal gaming activity that exceeds 30 percent but not 40 percent of the net revenues if the Chairman is satisfied that the capital investment required, and income projections, for such tribal gaming activity require the additional fee requested by the Indian tribe.
   25 U.S.C.A. § 2711(c)(2).

sists of "social games [played] solely for prizes of minimal value or traditional forms of Indian gaming engaged in by individuals as a part of, or in connection with, tribal ceremonies or celebrations." *Id.* § 2703(6). The Act places class I gaming within the exclusive jurisdiction of the Indian tribes. *Id.* § 2710(a)(1). All parties agree that the Tribe's gaming in issue here is not of the class I type.

Class II gaming includes bingo, related activities,[2] and certain non-banking card games.[3] Blackjack is expressly excluded from the general definition of class II activities. *Id.* § 2703(7)(A), (B). A tribe may engage in class II gaming if "such Indian gaming is located within a State that permits such gaming for any purpose by any person," *id.* § 2710(b)(1)(A), and the tribe permits such gaming by ordinance, *id.* § 2710(b)(1)(B).

Class III gaming encompasses all forms of gaming which are not in class I or class II. *Id.* § 2703(8). The Act permits class III gaming if, among other requirements, it is "conducted in conformance with a Tribal–State compact entered into by the Indian tribe and the State." *Id.* § 2710(d)(1)(C).

The Act contains a grandfather provision which accords class II treatment to games which would otherwise be classified as class III in certain situations involving card games already in existence. The grandfather provision explicitly states that card games which were already operating in four specified states, including South Dakota, on or before May 1, 1988, will be included in class II gaming "but only to the extent of *the nature and scope* of the card games that were actually operated." *Id.* § 2703(7)(C) (emphasis added). The Tribe claims that this grandfather provision removes its blackjack activities from class III, which would require a Tribal–State

compact, to class II, which does not require such a compact.

The district court concluded that the grandfather provision did not apply to the Tribe's blackjack operations because the "nature and scope" requirement was not met. Since the Tribe had expanded the hours of operation, the court found that there had been an increase in the scope of the blackjack game occurring after the cut-off date of May 1, 1988. Accordingly, the court classified the Tribe's blackjack activities as class III gaming. Since no Tribal–State compact permitted the blackjack gaming here, the court held that the Act's requirements were not met.

The court held, alternatively, that the blackjack game was unlawful under the Act even if the grandfather provision did bring the game within class II. The court based this conclusion on the statutory provision declaring that class II gaming is lawful only if it "is located within a State that permits such gaming for any purpose by any person, organization or entity." *Id.* § 2710(b)(1)(A). Since South Dakota permits such gaming, i.e., blackjack, only if there is a limit on bets of $5, S.D. Codified Laws Ann. § 42–7B–14 (Supp.1989), and the Tribe's venture permitted betting up to $100, the court found the tribal gaming to be illegal under the Act because it was of a different type than was permitted by South Dakota. Therefore, the court enjoined the Tribe from operating a blackjack enterprise on its tribal lands. This appeal followed.[4]

## I.

The Tribe argues that the district court erred in finding that the requirements of the grandfather provision were not met; this led the court to treat the Tribe's blackjack activities as class III gaming rather than grandfathering them under class II. Whether this blackjack gaming is

---

**2.** Class II includes pull-tabs, lotto, punch boards, tip jars, instant bingo, and similar games. 25 U.S.C.A. § 2703(7)(A)(i).

**3.** Non-banking card games are games played against other players, as opposed to banking card games, which are played against the house.

**4.** The issues before us require that we consider both the existing federal and state legislation regulating gambling, which reflect legislative determinations that the gambling activities are socially justified. This exercise of legislative wisdom is binding on us and forecloses reflection on such issues, which might prove to be troubling.

grandfathered under class II turns specifically on whether the Tribe has altered the "nature and scope" of its card games after the May 1, 1988 cut-off date, thus rendering the grandfather provision inapplicable. Our analysis must begin with the text of the grandfather clause, which reads in its entirety:

Notwithstanding any other provision of this paragraph, the term "class II gaming" includes those card games played in the State of Michigan, the State of North Dakota, the State of South Dakota, or the State of Washington, that were actually operated in such State by an Indian tribe on or before May 1, 1988, but only to the extent of the nature and scope of the card games that were actually operated by an Indian tribe in such State on or before such date, as determined by the Chairman.[5]

25 U.S.C.A. § 2703(7)(C).

■ The parties agree that there have been changes in the Tribe's blackjack enterprise after the critical date of May 1, 1988; the controversy centers around whether such changes altered the "nature and scope" of the card game. When the blackjack operation opened in April 1988, the game involved fourteen tables and was conducted three days per week from 5:00 p.m. until 1:00 a.m. The pot limits were set at a $2.00 minimum and a $100 maximum. After May 1, 1988, the Tribe increased the number of tables to twenty and expanded the hours of operation so that gaming was conducted Monday through Thursday from 5:00 p.m. until 1:00 a.m., and continuously from 5:00 p.m. Friday until 1:00 a.m. Monday. The blackjack wager and pot limits, however, have not changed since the game opened.

In interpreting the "nature and scope" language in the grandfather provision, "[o]ur starting point, as in all cases involving statutory interpretation, 'must be the language employed by Congress.'" *United States v. Goodyear Tire & Rubber Co.,* — U.S. ——, 110 S.Ct. 462, 467, 107

L.Ed.2d 462 (1989) (quoting *Reiter v. Sonotone Corp.,* 442 U.S. 330, 337, 99 S.Ct. 2326, 2330, 60 L.Ed.2d 931 (1979)). We have set forth the statutory language above. There are situations, however, when "reliance on the plain language ... alone is not entirely satisfactory." *Public Citizen v. United States Dep't of Justice,* — U.S. ——, 109 S.Ct. 2558, 2565, 105 L.Ed.2d 377 (1989) (quoting lower court, 691 F.Supp. 483, 488 (D.D.C.1988)). We believe that this is such a case, as the "nature and scope" clause is not defined in the Act, and an examination of legislative history can shed light on the intent of Congress in enacting the statutory provision in issue here.

The Senate Report accompanying S. 555, the bill ultimately enacted as the Indian Gaming Regulatory Act, is especially helpful in discerning Congress' intent in utilizing the "nature and scope" language:

Subparagraph 4(8)(C) [25 U.S.C.A. § 2703(7)(C)] provides that card games actually operated by tribes in certain states on or before May 1, 1988, will continue to operate under tribal/Commission jurisdiction as class II games with the caveat that the games may not change their character, i.e., *new or different kinds of games may not be substituted* for the games that are grandfathered and *the games must be played with the same pot and wager limits as currently operated. It is not the Committee's intention, however, to restrict these grandfathered games to a specific number of chairs, tables, or other similar conditions of operation. These are factors that are determined by the marketplace; games may contract or expand.*

S.Rep. No. 446, 100th Cong., 2d Sess. 10, *reprinted in* 1988 U.S.Code Cong. & Admin.News 3071, 3080 (emphasis added). This language clearly indicates that the Tribe did not alter the "nature and scope" of the existing card games by increasing the number of tables; the issue thus be-

---

**5.** "Chairman" refers to the Chairman of the National Indian Gaming Commission, which is established by the Act. As of the date of filing this

opinion, this commission had not yet been established.

comes whether the changes in hours and days of operation are "other similar conditions of operation." The Tribe contends that the change in the periods of operation is similar to a change in the number of tables because both are merely responses to the marketplace. It argues that the congressional concern was not that a tribe would expand the periods of gaming operation, but that a tribe would increase wager or pot limits, or expand into new types of games or locations.

The Government responds by arguing that increasing the periods of operation changes the nature and scope of the gaming significantly more than adding a few tables.[6] It supports this argument by stressing the fact that class II non-banking card games are permitted only if "played in conformity with those laws and regulations (if any) of the State regarding hours or periods of operation of such card games or limitations on wagers or pot sizes in such card games." 25 U.S.C.A. § 2703(7)(A)(ii).

According to the Government, this is evidence that Congress viewed periods of operation similarly to wager or pot sizes and, therefore, changing periods of operation changes the scope of the game.

The Government's argument is unpersuasive in light of the legislative history leading to adoption of the "nature and scope" requirement.[7] The "nature and scope" language in issue here was also used in earlier versions of the bill.[8] The language first appeared in the grandfather provision of H.R. 1920, 99th Cong., 2d Sess. (1986), the primary vehicle for Indian gaming legislation in the 99th Congress. During the debate preceding the passage of H.R. 1920 by the House, Representative Coehlo observed that the grandfathered games "will be subject to regulation by the national commission and will be forbidden from *expanding into other forms* of class III gaming than those they were operating as of January 1 this year." 132 Cong.Rec. 8187 (1986) (emphasis added). In a colloquy between Rep-

**6.** The Government also relies on a statement in the Senate Report that "there is no adequate Federal regulatory system in place for class III gaming, nor do tribes have such systems for the regulation of class III gaming currently in place." S.Rep. No. 100–446, *supra*, at 13, 1988 U.S.Code Cong. & Admin.News 3083. The Government urges that this means that Congress believed that tribes are unable to regulate blackjack and, therefore, such games should not be grandfathered into class II. We are not persuaded. The Senate Report makes this statement in the context of discussing class III gaming which is not yet in operation, thus requiring a Tribal–State compact. We believe that Congress intended that class III gaming already in existence be treated differently from class III gaming not yet in existence. Otherwise, the grandfather provision would be meaningless. The rationale in according different treatment to the gaming here, which would be class III if not for the grandfather provision, is that a tribe with blackjack gaming already operating could also already have a regulatory system in place. Furthermore, Congress intended that even class III gaming which is not grandfathered into class II could potentially have significant tribal oversight. If a tribe elects to engage in Class III gaming pursuant to a compact with the State, "this is not to say that tribal governments can have no role to play in regulation of class III gaming—many can and will." *Id.* at 14, 1988 U.S.Code Cong. & Admin.News 3084.

**7.** Initially, we note that the grandfather provision expressly refers to card games in operation within the State of South Dakota on or before

May 1, 1988. As introduced, S. 555 did not refer specifically to any states. The Addendum to the Tribe's brief contains a letter from Russell Hawkins, Sisseton–Wahpeton Tribal Chairman, to Thomas Daschle, Senator from South Dakota, dated June 20, 1988, which requested that South Dakota be added to the grandfather provision during the time for technical changes. The letter also stated that this gaming was the only class III gaming conducted by any Indian tribe in South Dakota at that time. The Government does not dispute this. We do not know whether South Dakota was added to the provision in response to the Tribe's letter but circumstances and the absence of any other explanation suggest that this was the case. We view this is as persuasive evidence that Congress intended to grandfather the Tribe's card games under class II.

**8.** Earlier versions of the bill expressly required that the grandfathered games be "otherwise legal under existing law." *See* 132 Cong.Rec. 8179 (1986); 133 Cong.Rec. 3738 (1987). This requirement was omitted in S. 555 as enacted. 25 U.S.C.A. § 2703(7)(C). This omission provides further support for our holding. "Where Congress includes limiting language in an earlier version of a bill but deletes it prior to enactment, it may be presumed that the limitation was not intended." *Russello v. United States*, 464 U.S. 16, 23–24, 104 S.Ct. 296, 300–301, 78 L.Ed.2d 17 (1983).

resentative Coehlo and Representative Udall, the principal sponsor of the earlier bill, Coehlo further clarified the "nature and scope" requirement by stating that, "It is my understanding, that under this language, any grandfathered activity will be limited to the *number of separate operations* which were in existence on January 1, 1986, and *only that kind of gaming* which was in existence on that date." *Id.* (emphasis added).

The Senate Report on this earlier version of the Act, H.R. 1920, is also enlightening. In explaining the grandfather provision, the Report states that the phrase "[n]ature and scope specifically refers to *pot sizes and bet limits* of the existing games." S.Rep. No. 493, 99th Cong., 2d Sess. 16 (1986) (emphasis added). Thereafter, the Senate did not vote on H.R. 1920 and the measure died.

When the 100th Congress convened, Senator Inouye introduced S. 555, which was ultimately enacted. As previously discussed, the Senate Report stated that "new or different kinds of games may not be substituted for the games that are grandfathered and the games must be played with the same pot and wager limits as currently operated." S.Rep. No. 100–446, *supra*, at 10, 1988 U.S.Code Cong. & Admin.News 3080. The Report then further clarified the grandfather provision by stating that the Select Committee on Indian Affairs did not intend to "restrict these grandfathered games to a specific number of chairs, tables, or other similar conditions of operation." *Id.* A colloquy between Senator Reid and Senator Inouye which occurred immediately prior to passage of S. 555 also provides insight into congressional intent:

> While the bill may permit the expansion of particular operations which were in existence as of May 1, 1988, for example, by the addition of gaming tables or seats in an existing establishment, it does not authorize the expansion of such operations to new locations, the establishment of new operations, or the institution of new games at existing operations. In other words, *both the gambling operation and the particular games played* in that operation must have been in place

on or before May 1, 1988, in order to have the benefit of this provision.

134 Cong.Rec. S12651 (daily ed. Sept. 15, 1988) (emphasis added).

Our study of this legislative history persuades us that Congress did not intend that a change in hours of operation be viewed as altering the "nature and scope" of the card game. The Senate Report explains that the "nature and scope" requirement is not intended to prevent a gaming venture from contracting or expanding in response to changes in the marketplace. We are satisfied that the Tribe's action in increasing its times of operation is merely the type of response to the marketplace which Congress intended to permit. The legislative history reveals that Congress sought to prevent a tribe, whose card games were grandfathered under class II, from later adding new or different games, or later increasing pot or wager limits. That is not the situation here. The Tribe has not added or changed card games, nor has it changed pot or wager limits. Accordingly, we are convinced that the Tribe has not altered the "nature and scope" of its card game since May 1, 1988, and therefore, that the grandfather provision accords class II treatment to the Tribe's blackjack gaming.

## II.

We now address the district court's alternative holding that the blackjack gaming was unlawful, even if accorded class II treatment, because it was not conducted in compliance with South Dakota law establishing wager limits and other gaming constraints. The district court based its conclusion on the following statutory requirement for class II gaming:

> An Indian tribe may engage in, or license and regulate, class II gaming on Indian lands within such tribe's jurisdiction, if—
>> (A) such Indian gaming is *located within a State that permits such gaming for any purpose by any person, organization or entity....*

25 U.S.C.A. § 2710(b)(1)(A) (emphasis added). Since the Tribe employed higher bet-

ting limits than those permitted by South Dakota law, the court held that the Act's requirement that the gaming be within a state permitting such gaming was not satisfied.

The Tribe argues that the district court's interpretation of the Act, in effect, grants the State regulatory authority over class II gaming and therefore directly conflicts with congressional intent. The Tribe contends that the district court's holding nullifies the grandfather clause, as well as the distinction between class II and class III gaming.

The Government supports the district court's interpretation of this statutory provision by contending that Congress intended the distinction between class II and class III gaming to be that the former is regulated by the Tribe under federal oversight, while the latter is regulated pursuant to the terms of a Tribal–State compact. According to the Government, in either case, state law may supply substantive regulations on gaming. Requiring the Tribe to comply with state substantive law on gaming does not require the Tribe to submit to the jurisdiction of South Dakota, the Government argues, because this is merely an instance of Congress assimilating state law by reference. The Government identifies other instances where the Act has assimilated state law and applied it to class II gaming. Non-banking card games must comply with state hour and wager limits, *id.* § 2703(7)(A)(ii), and tribal licensing and eligibility requirements for games owned by non-Indians must be "at least as restrictive as those established by State law governing similar gaming," *id.* § 2710(b)(4)(A).

■ We are convinced that Congress intended that class II gaming be subject to tribal and federal oversight, and that the states' regulatory role be limited to overseeing class III gaming, pursuant to a Tribal–State compact. Permitting South Dakota to apply its substantive law to the blackjack game here, which is properly classified as class II gaming, conflicts with congressional intent.

As we have stated, our starting point for discerning congressional intent in enacting legislation must be the statutory language itself. The Act defines "class II gaming" to include several types of activities, and, significantly, the prerequisites for lawfully conducting these activities differ. Class II gaming includes bingo, certain non-banking card games, certain grandfathered card games, and certain grandfathered electronic games and slot machines. 25 U.S.C.A. § 2703(7). The Act expressly requires that non-banking card games must comply with state regulations governing periods of operation and wager or pot limits, *id.* § 2703(7)(A)(ii), but the Act contains no indication that other types of class II gaming must comply with such state regulations.

The gaming activity in issue here, blackjack, is specifically exempted from these state law requirements which apply to class II card games generally, by the introductory language in the grandfather provision stating that the grandfathered games are considered class II "[n]otwithstanding any other provision of this paragraph." *Id.* § 2703(7)(C). Consequently, the grandfathered class II card games include card games which would otherwise be excluded from class II because they did not comply with state laws governing periods of operation or wager and pot sizes. The Senate Report supports this construction. As discussed earlier in the context of the "nature and scope" requirement, the Senate Report states that the grandfathered games "must be played with the same pot and wager limits as currently operated." S.Rep. No. 100–446, *supra,* at 10, 1988 U.S.Code Cong. & Admin.News 3080. This indicates that the pot and wager limits for the grandfathered games are to be determined by referring to the limits at the time the games were grandfathered into class II; and not by reference to state law, as is the case with other class II card games. The Government concedes that it is difficult to reconcile the district court's ruling, which requires the Tribe's blackjack game to comply with South Dakota law governing pot and wager limits, with the Senate Report, which requires that the grandfathered games "be played with the

same pot and wager limits as currently operated." (Appellee's Brief at 18).

■ We now examine the specific statutory provision upon which the district court based its holding that the Tribe had not complied with the Act. Section 2710(b)(1)(A) permits a tribe to engage in class II gaming if "such Indian gaming is located within a State that permits such gaming for any purpose by any person, organization or entity." Contrary to the district court's holding, we believe that the legislative history reveals that Congress intended to permit a particular gaming activity, even if conducted in a manner inconsistent with state law, if the state law merely regulated, as opposed to completely barred, that particular gaming activity.[9]

The statutory language in issue first appeared in H.R. 1920, which, as previously discussed, was the principal Indian gaming legislation considered by the 99th Congress. The Senate Report on this earlier measure noted that if state law completely barred class II gaming, then the Act would also bar such gaming. S.Rep. No. 99–493, *supra*, at 14. If the state permitted some form of class II gaming, however, then a tribe could engage in such gaming subject to the Act's requirements. *Id.* "[T]ribes may conduct certain defined games (bingo, lotto and cards) under the Federal regulatory frame-work, provided the laws of the state allow such games to be played at all." *Id.* at 2.

The Senate Report accompanying the bill ultimately enacted, S. 555, also discussed the difference between a state prohibiting, as opposed to merely regulating, a particular gaming activity:

The phrase "for any purpose by any person, organization or entity" makes no distinction between State laws that allow class II gaming for charitable, commercial, or governmental purposes, or the nature of the entity conducting the gaming. *If such gaming is not criminally prohibited by the State in which tribes are located, then tribes, as governments, are free to engage in such gaming.*

S.Rep. No. 100–446, *supra,* at 12, 1988 U.S.Code Cong. & Admin.News 3082 (emphasis added).

The Senate Report is replete with explanations of the respective roles played by the tribes, federal government, and state government in regulating Indian gaming. "S. 555 provides for a system for joint regulation by tribes and the Federal Government of class II gaming on Indian lands and a system for compacts between tribes and States for regulation of class III gaming." *Id.* at 1, 1988 U.S.Code Cong. & Admin.News 3071. The Report states that "S. 555 recognizes primary tribal jurisdiction over bingo and card parlor operations although oversight and certain other powers are vested in a federally established National Indian Gaming Commission." *Id.* at 3, 1988 U.S.Code Cong. & Admin.News 3073. Furthermore, "unless a tribe affirmatively elects to have State laws and State jurisdiction extend to tribal lands, the Congress will not unilaterally impose or allow State jurisdiction on Indian lands for the regulation of Indian gaming activities." *Id.* at 5–6, 1988 U.S.Code Cong. & Admin. News 3075–76. In explaining the states' role under the Act, the Senate Report explains:

The mechanism for facilitating the unusual relationship in which a tribe might affirmatively seek the extension of State jurisdiction and the application of state laws to activities conducted on Indian land is a tribal-State compact. *In no instance, does S. 555 contemplate the extension of State jurisdiction or the application of State laws for any other purpose.*

*Id.* at 6, 1988 U.S.Code Cong. & Admin.

---

**9.** Even comments from a Representative opposing S. 555 support this interpretation. When the bill was considered in the House, Representative Henry of Michigan urged opposition to the bill because it "retroactively grandfather[ed] existing illegal gambling operations in a number of States." 134 Cong.Rec. H8155 (daily ed. Sept. 26, 1988). He further stated, "I come from one of the ... States in which this bill circumvents State law by grandfathering in existing illegal gambling...." *Id.*

News 3076 (emphasis added).[10] The Senate Report also shows that Congress was fully aware of the strong desire on the part of Indian tribes to avoid state regulation of gaming. *See id.* at 4, 5, 13.

One week after S. 555 was introduced, the Supreme Court decided *California v. Cabazon Band of Mission Indians*, 480 U.S. 202, 107 S.Ct. 1083, 94 L.Ed.2d 244 (1987). In *Cabazon*, the Court utilized a prohibitory/regulatory distinction to determine whether California had criminal jurisdiction over offenses involving Indians under Public Law 83–280, which authorized the transfer of criminal jurisdiction over Indians from the federal government to states in certain circumstances. The Court held in *Cabazon* that tribes have a right to conduct gaming on Indian lands without being subject to state regulation if located in a state which regulates but does not prohibit gaming. 480 U.S. at 209–10, 107 S.Ct. at 1088–89. While *Cabazon* did not involve the gaming act here, in developing the Act considered here, Congress adopted a modified version of the *Cabazon* test to aid in deciding whether "such Indian gaming is located within a State that permits such gaming for any purpose by any person, organization or entity," within the meaning of 25 U.S.C.A. § 2710(b)(1)(A):

> [T]he Committee anticipates that Federal courts will rely on the distinction between State criminal laws which prohibit certain activities and the civil laws of a State which impose a regulatory scheme upon those activities to determine whether class II games are allowed in certain States. This distinction has been discussed by the Federal courts many times, most recently and notably by the Supreme Court in *Cabazon*.

S.Rep. No. 100–446, *supra*, at 6, 1988 U.S. Code Cong. & Admin.News 3076. Thus, as a court, our task is to assess whether South Dakota's gaming law is prohibitory or regulatory in nature in order to determine the effect, if any, of State law on the Tribe's blackjack operations.

This prohibitory/regulatory distinction is consistent with congressional perceptions of the relationship between Indian tribes, federal government, and state government. As explained by Senator Evans when S. 555 was considered, the Act must be construed in light of the following principle:

> When [Congress] has chosen to restrict the reserved sovereign rights of tribes, the courts have ruled that such abrogations of tribal rights must have been done expressly and unambiguously.
>
> ... Therefore, if tribal rights are not explicitly abrogated in the language of this bill, no such restrictions should be construed. This act should not be construed as a departure from established principles of the legal relationship between the tribes and the United States. Instead, this law should be considered within the line of developed case law extending over a century and a half by the Supreme Court, including the basic principles set forth in the *Cabazon* decision.

134 Cong.Rec. S12654 (daily ed. Sept. 15, 1988); *see also* S.Rep. No. 100–446, *supra*, at 5.

The Government argues that Congress has simply assimilated state law here. We must reject this argument. The Act contains no explicit abrogation of the right of tribes to conduct gaming without being subject to state regulation if the tribe is located in a state which regulates but does not prohibit gaming. We must also be cognizant of the following principle, as expressed by Representative Udall during consideration of S. 555:

> [W]hile this legislation does impose new restrictions on tribes and their members, it is legislation enacted basically for their benefit. I would expect that the Federal courts, in any litigation arising out [of] this legislation, would apply the Supreme Court's time-honor[ed] rule of construc-

---

**10.** Even if a tribe engages in class III gaming pursuant to a compact with the State, it does not necessarily follow that the tribe is subject to the entire body of State law on gaming. The tribe and the State may negotiate terms such as "the application of the criminal and civil laws and regulations of the Indian tribe or the State that are directly related to, and necessary for, the licensing and regulation of such activity." 25 U.S.C.A. § 2710(d)(3)(C)(i).

tion that *any ambiguities in legislation enacted for the benefit of Indians will be construed in their favor.*

134 Cong.Rec. H8153 (daily ed. Sept. 26, 1988) (emphasis added).

The Senate Report on S. 555 also discusses section 2703(7)(A)(ii), which requires non-banking card games to conform with state regulations on periods of operation and wagers or pot sizes:

> Subparagraphs (I) and (II) [of 25 U.S. C.A. § 2703(7)(A)(ii) ] are to be read in conjunction with [25 U.S.C.A. § 2710] sections (a)(2) and (b)(1)(A) to determine which particular card games are within the scope of class II. *No additional restrictions are intended by these subparagraphs. The Committee notes that, while existing law does not require that Indian card games conform with State law,* it agreed to adoption of bill language to provide that these card games be operated in conformity with laws of statewide application with respect to hours or periods of operation, or limitations on wagers or pot sizes for such card games.

S.Rep. No. 100–446, *supra,* at 9, 1988 U.S. Code Cong. & Admin.News 3079 (emphasis added). This language is significant in revealing that Congress intended that even non-banking card games, which the Act expressly required to conform with state law governing periods of operation and wager and pot sizes, did not have to conform with state law requirements other than those expressly stated.[11] Since the activities in issue here are exempted from complying with state law on hours of operation and wager and pot sizes by virtue of the "notwithstanding" clause in the grandfather provision, the underscored language applies without qualification here: "[E]xisting law does not require that Indian card games conform with State law."

■ We now turn to the determinative issue of whether the South Dakota law governing blackjack activities is prohib-

itory, or merely regulatory, in nature. Subject to State regulation, South Dakota permits bingo, S.D. Codified Laws Ann. § 22–25–25 (Supp.1989), parimutuel horse and dog race betting, *id.* §§ 42–7–56 to –100 (1985 & Supp.1989), a State lottery, *id.* §§ 42–7A–1 to –55 (Supp.1989), slot machines, *id.* §§ 42–7B–1 to –53 (Supp.1989), and certain card games, including blackjack, *id.* At the time these actions were commenced, South Dakota prohibited card games "wherein anything valuable is wagered upon the outcome." *Id.* § 22–25–1 (1985). However, South Dakota has always allowed card games played for amusement "with no intent of gambling." *State v. White,* 34 S.D. 96, 99, 147 N.W. 264, 265 (1914). Since the institution of these actions, South Dakota has amended its constitution to permit commercial card games, including blackjack, to be lawfully operated in the City of Deadwood, South Dakota. Subsequently, the State legislature enacted implementing legislation. *See* S.D. Codified Laws Ann. § 42–7B–1 (Supp. 1989).

*Cabazon* is instructive in our task of discerning whether this body of State law is prohibitory, or merely regulatory, in nature. In concluding that California's law on bingo was regulatory, rather than prohibitory, the Court made the following observations about California law:

> California does not prohibit all forms of gambling. California itself operates a state lottery, and daily encourages its citizens to participate in this state-run gambling. California also permits parimutuel horse-race betting. Although certain enumerated gambling games are prohibited ..., games not enumerated ... are permissible.... [B]ingo is legally sponsored by many different organizations and is widely played in California.... In light of the fact that California permits a substantial amount of gambling activity, including bingo, and actually promotes gambling through its state

---

11. Even class III games, which may be lawfully engaged in only pursuant to a Tribal–State compact, are not necessarily required to conform to state laws on periods of operation. The terms of the compact "may include agreements on days and hours of operation." S.Rep. No. 100–

446, *supra,* at 14, 1988 U.S.Code Cong. & Admin. News 3084. This means that state law on periods of operation is not necessarily imposed even upon class III gaming; rather, it is subject to negotiation.

lottery, we must conclude that California regulates rather than prohibits gambling in general and bingo in particular.

480 U.S. at 210–11, 107 S.Ct. at 1089–90 (citations omitted).

Similarly, many of the forms of gambling permitted by California are also permitted by South Dakota law, e.g., a State lottery, parimutuel horse race betting, and bingo. Consistent with *Cabazon*, we conclude that South Dakota regulates, rather than prohibits, gambling in general and blackjack in particular. Therefore, the Act's requirement that class II gaming, such as the blackjack here, be "located within a State that permits such gaming for any purpose by any person, organization or entity," 25 U.S.C.A. § 2710(b)(1)(A), is fulfilled.

### III.

In conclusion, we hold that the Tribe's blackjack operation is grandfathered under class II gaming, and as such, the game need not comply with South Dakota law on wager and pot limits. Accordingly, we reverse the order of the district court enjoining the Tribe from operating its blackjack game and remand to the court to enter a declaratory judgment consistent with this opinion.