**MASHANTUCKET PEQUOT TRIBE**

v.

**STATE OF CONNECTICUT, et al.**

**Civ. No. H–89–717 (PCD).**

United States District Court,
D. Connecticut.

May 15, 1990.

Jackson T. King, Jr., Brown, Jacobson, Jewett & Laudone, Mystic, Conn., Barry A. Margolin, Robert L. Gips, Gregory W. Sample, Tureen & Margolin, Portland, Me., for plaintiff.

Richard M. Sheridan, Asst. Atty. Gen., MacKenzie Hall, Hartford, Conn., for defendants.

## RULING ON CROSS–MOTIONS FOR SUMMARY JUDGMENT

DORSEY, District Judge.

Plaintiff sues under the Indian Gaming Regulatory Act ("IGRA"), 25 U.S.C. § 2701, *et seq.*,[1] and now moves for summary judgment: (1) ordering the State, as required by IGRA, to negotiate with the Tribe concerning the terms of operation of games of chance, as defined by Conn.Gen. Stat. § 7–186a, *et seq.*, on the Reservation, including any rules concerning prizes, wagers and frequency; (2) ordering the State and Tribe to conclude a Tribal–State com-

---

1. District courts have jurisdiction over a cause of action by an Indian tribe alleging the failure of a State (a) to negotiate with the Tribe for the purpose of forming a Tribal–State compact or (b) to conduct such negotiations in good faith. 25 U.S.C. § 2710(d)(7)(A)(i).

pact governing gaming activities on the Reservation within sixty days of the date of this order pursuant to 25 U.S.C. § 2710(d)(7)(B)(iii) and to appoint a mediator to resolve any impasse in accordance with 25 U.S.C. § 2710(d)(7)(B)(iv).

Defendants cross-move arguing that this court lacks jurisdiction to entertain the present action since the Tribe has failed to adopt a tribal ordinance which would permit casino-type gambling upon the reservation. Defendants also contend that the "Las Vegas nights" which the State permits non-profit organizations to conduct are not comparable to casino-type gambling and hence are not permissible Class III gambling activity pursuant to 25 U.S.C. § 2710(d)(1)(B).

*Background*

On March 30, 1989, the Tribe requested Governor O'Neill to enter negotiations for the purposes of forming a Tribal–State compact governing gaming activities on the Tribe's reservation pursuant to IGRA. On May 1, 1989, the Governor responded that he had requested the State's Acting Attorney General to review IGRA and determine the State's obligations thereunder.

The State permits certain types of organizations to conduct games of chance at Las Vegas nights subject to the restrictions in Conn.Gen.Stat. § 7–186a, *et seq.* On July 19, 1989, Acting Attorney General Riddle advised that the fact that Connecticut permits Las Vegas nights does not compel it to negotiate with the Tribe under IGRA when the ultimate purpose is construction and operation of a casino.[2] The State recognized its responsibility under IGRA to negotiate in good faith concerning other forms of gaming permitted in Connecticut and did not dispute the Tribe's right to conduct Las Vegas nights subject to statutory and regulatory restrictions. She also noted that the Governor would shortly appoint a task force or negotiating team for that purpose.

Plaintiff asserts that the State has not appointed such a team nor commenced negotiations and that over six months has elapsed since its request. The State contends that it is under no obligation to enter into negotiations until plaintiff adopts a tribal ordinance governing its proposed gaming activities. The State also asserts that it "would gladly participate in 'friendly' litigation designed to secure a federal court declaration of the permissibility of casino gambling on the reservation."

*Discussion*

IGRA defines the rights of Indian tribal governments to conduct gaming activities on their reservations. The Act settled the legislative debate which followed court decisions upholding the right of tribes to conduct public bingo games on Indian lands. *See California v. Cabazon Band of Mission Indians,* 480 U.S. 202, 107 S.Ct. 1083, 94 L.Ed.2d 244 (1987); *Mashantucket Pequot Tribe v. McGuigan,* 626 F.Supp. 245 (D.Conn.1986); *Barona Group of Capitan Grande Band of Mission Indians v. Duffy,* 694 F.2d 1185, 1187 (9th Cir.1982), *cert. denied,* 461 U.S. 929, 103 S.Ct. 2091, 77 L.Ed.2d 301 (1983); *Seminole Tribe v. Butterworth,* 658 F.2d 310, 313 (5th Cir.1981), *cert. denied,* 455 U.S. 1020, 102 S.Ct. 1717, 72 L.Ed.2d 138 (1982); *Oneida Tribe of Indians v. Wisconsin,* 518 F.Supp. 712, 720 (W.D.Wis.1981). IGRA provides that "Indian tribes have the exclusive right to regulate gaming activity on Indian lands if the gaming activity is not specifically prohibited by Federal law and is conducted within a State which does not, as a matter of criminal law and public policy, prohibit such gaming activity." 25 U.S.C. § 2701(5).

IGRA establishes three classes of gaming which are subject to differing degrees of federal, state, and tribal regulation. Class I gaming is limited to social games, either ceremonial or for nominal prizes, 25 U.S.C. § 2703(6), and is free of all outside regulation. *Id.,* § 2710(a)(1). Class II gaming includes bingo and related games, as well as certain non-banking card games, i.e., games played against other players as

---

**2.** Plaintiff seeks a compact permitting the Tribe to expand its high-stakes bingo to games of chance without the wager and prize limits imposed by state law. Exhibit C to Plaintiff's Motion.

opposed to the house. *Id.*, § 2703(7). These games are free of state regulation but subject to some federal oversight by the National Indian Gaming Commission ("NIGC"). *Id.*, §§ 2710(b), (c).

All other forms of gaming are classified as class III gaming. 25 U.S.C. § 2703(8). Class III gaming activities are lawful on Indian lands only if such activities are:

> (A) authorized by an ordinance or resolution that—(i) is adopted by the governing body of the Indian tribe having jurisdiction over such lands, (ii) meets the requirements of subsection (b) of this section, and (iii) is approved by the Chairman [of the NIGC], (B) located in a State that permits such gaming for any purpose by any person, organization, or entity, and (C) conducted in conformance with a Tribal–State compact entered into by the Indian tribe and the State under paragraph (3) that is in effect.

25 U.S.C. § 2710(d)(1).

A.  *State's Obligation to Negotiate in Good Faith*

■ In its first claim for relief, plaintiff contends that "[t]he State's failure to negotiate in good faith to conclude a Tribal–State compact governing the conduct of gaming activities violates [IGRA]." Complaint, ¶ 13. IGRA provides that any tribe having jurisdiction over lands upon which class III gaming is to be conducted shall request the State in which such lands are located to enter into negotiations for the purpose of entering into a compact governing such gaming and that, upon receiving such request, the State shall negotiate with the tribe in good faith to enter into such a compact. 25 U.S.C. § 2710(d)(3)(A).

It is undisputed that plaintiff, on March 30, 1989, requested the State to enter into negotiations under IGRA. A tribe may not initiate a cause of action for a State's failure to negotiate until 180 days after it requested the State to enter negotiations. 25 U.S.C. § 2710(d)(7)(B)(i). Plaintiff filed its complaint on November 3, 1989, over two hundred days after its request. If the court finds that the State has failed to negotiate in good faith, it shall order the State and tribe to conclude a compact with-

in sixty days or, in the event of an impasse, submit the dispute to a court-appointed mediator. *Id.*, § 2710(d)(7).

The parties dispute whether plaintiff's March 30, 1989 letter triggered the State's obligation to enter into compact negotiations. The State argues that no obligation arose, despite the request, until the tribe adopted an ordinance permitting the type of gambling proposed upon its lands, in this instance casino gambling, and obtained the approval of the Chairman of NIGC. The State argues that the plain language of IGRA establishes the order in which the prerequisites to class III gaming must occur, i.e., authorization under a tribal ordinance; location in a permitting state; and conduct under a Tribal–State compact. 25 U.S.C. § 2710(d)(1). Plaintiff argues that IGRA sets no precondition for negotiations other than a tribal request, as it flatly states that, upon receiving a request, "the State shall negotiate with the Indian tribe in good faith to enter into such a compact." *Id.*, § 2710(d)(3)(A).

The State's argument that a tribal ordinance is a condition precedent to any obligations to negotiation a compact covering class III gaming is based on § 2710(d)(1). This section, however, does not articulate any time sequence. It sets forth three conditions for class III gaming to be lawful on Indian lands. That a tribal ordinance is listed first, as a requirement, does not establish it as a precondition to compact negotiations. Further, § 2710(d)(2)(C) provides that, even with publication of a tribal ordinance approved by the Commissioner, class III gaming activity shall be fully subject to the terms and conditions of the compact. IGRA does not expressly precondition compact negotiations on publication of an effective tribal ordinance.

Second, the State contends that absent an enabling ordinance, a request for negotiation produces an incongruous result. The State argues that it should not be compelled to expend resources in negotiation only to have the tribe's governing body fail to adopt an ordinance approving all or the particular form of class III gaming contem-

plated in the negotiated compact.[3] Adoption of an ordinance as a precondition to any negotiations would encourage the Tribe to adopt an ordinance authorizing all forms of class III gaming to avoid limiting its bargaining position. Plaintiff asserts that it sought to negotiate a compact consistent with its objectives, and which at the same time would accommodate the State's concerns. Plaintiff argues that an appropriate ordinance cannot be framed until it knows the type and scale of gaming to which the state would agree and the relative jurisdictional roles to be played by the Tribe and the State.

The State does not offer any reason why the plain language of IGRA, which requires the State to enter negotiations based solely upon a tribal request, should be ignored. Nowhere does IGRA require, either expressly or implicitly, that an ordinance be adopted and approved prior to compact negotiations. Upon receiving a request to enter into compact negotiations, "the State shall negotiate with the Indian tribe in good faith to enter into such a compact." 25 U.S.C. § 2710(d)(3)(A). The obligation to negotiate cannot be more plain or unconditioned.

The State contends that treating the ordinance requirement as a precondition to compact negotiations will ensure that any request to negotiate is received from an authorized representative of the tribe. The State does not contend nor show that there is any lack of authority in this instance. Further, the State has ample methods to ensure that a request validly invokes IGRA and constitutes the authorized request of the tribal council. An ordinance is not the only manifestation of a tribe's genuine request for compact negotiations. This State argument is meritless.

Congress is thus found to have defined unambiguously a single precursor to the State's obligation to enter compact negotiations, i.e., a request from the tribe. 25 U.S.C. § 2710(d)(3)(A). Neither the language of nor congressional intent underlying IGRA warrant finding an additional precondition to negotiation. Accordingly, plaintiff's motion for summary judgment is granted as to its first claim for relief and defendants' cross-motion is denied.

### B. *Scope of Negotiations*

▮ The parties cross-move for declaratory relief as to whether the State is obligated to negotiate in good faith regarding the conduct of games of chance, as defined by Conn.Gen.Stat. § 7–186a, *et seq.*, including the days and hours of operation, types of wagers, and wager and pot limits. IGRA provides that, in the event of an impasse in compact negotiations, the parties shall submit their last best offer to a court-appointed mediator for his selection of the one "which best comports with the terms of [IGRA] and any other applicable federal law and with the findings and order of the court." 25 U.S.C. § 2710(d)(7)(B)(iv). Plaintiff argues that the court can thus provide guidance to the mediator on relevant issues and that such guidance will reduce the likelihood of an impasse. Since both parties seek declaratory relief on the same issue and "the controversy is definite and concrete, touching the legal relations of parties having adverse legal interest," declaratory relief is appropriate. *Aetna Life Ins. Co. of Hartford v. Haworth*, 300 U.S. 227, 240–41, 57 S.Ct. 461, 463–64, 81 L.Ed. 617 (1937).

Plaintiff seeks a declaration that the State must negotiate the conduct of games of chance, commonly referred to as "Las Vegas nights", to be conducted on the reservation. The issue presented is "whether the State can impose *all* of the restrictions imposed on charitable Las Vegas nights on tribal games of chance, without *any* negotiations." Plaintiff's Reply Memorandum at 10. The State asserts that it is not obliged to negotiate the scope of such games of chance to be conducted on the reservation

---

**3.** IGRA expressly authorizes the governing body of the Tribe to adopt an ordinance or resolution revoking any prior authorization of class III gaming thus rendering such activity illegal on tribal lands. *25 U.S.C.* § 2710(d)(2)(D). Thus, even under the State's concept of the sequence of the requisite steps, the State could negotiate a compact which could be rendered meaningless by subsequent tribal action.

since it does not generally permit "such gaming."

IGRA permits a tribe to conduct class III gaming if, among other requirements, it is "located in a state that permits such gaming for any purpose by any person, organization, or entity." 25 U.S.C. § 2710(d)(1)(B). Connecticut permits "[a]ny nonprofit organization, association or corporation [to] promote and operate games of chance [or Las Vegas nights] to raise funds for the purposes of such organization" subject to certain limitations and restrictions, such as limits on the size of wagers, character of prizes, and frequency of operation. *See* Conn.Gen.Stat. § 7–186a, *et seq.;* Conn. Agencies Regs. § 7–186k–1, *et seq.* Plaintiff contends that, since Las Vegas nights are permitted by the State, they fall within the "such gaming" language of IGRA and that therefore the State is obligated to negotiate the terms of a Tribal–State compact permitting the tribe to operate such games of chance. 25 U.S.C. § 2710(d)(3)(A). "In practical terms, the question is whether the Tribe can bargain for higher prize and bet limits and more frequent operation of the same types of games employed at Las Vegas nights, so as to enhance the utility of this form of gaming as a source of revenue." Plaintiff's Memorandum at 14–15.

The State argues that the use of the phrase "such gaming" as opposed to "such *type* of gaming" evidences the intent of Congress that, with regard to class III gaming, only the actual forms of gambling which the State has legalized need to be the subject of compact negotiations. Further, the State asserts that its interpretation is supported by the congressional findings prefacing IGRA that "Indian tribes have the exclusive right to regulate gaming activity on Indian lands if the gaming activity is not specifically prohibited by Federal law and is conducted within a State which does not, as a matter of criminal law and public policy, prohibit such gaming activity." 25 U.S.C. § 2701(5). The State argues that if the restrictions it has imposed on Las Vegas nights are removed, such gaming becomes professional gambling which is prohibited in Connecticut as a matter of criminal law and public policy.

■ In interpreting the "such gaming" language of IGRA, the "starting point as in all cases involving statutory interpretation, 'must be the language employed by Congress.'" *United States v. Goodyear Tire & Rubber Co.,* —— U.S. ——, 110 S.Ct. 462, 467, 107 L.Ed.2d 462 (1989), quoting *Reiter v. Sonotone Corp.,* 442 U.S. 330, 337, 99 S.Ct. 2326, 2330, 60 L.Ed.2d 931 (1979). Where the plain language is not instructive, a review of legislative history can shed light on Congressional intent. Further, "when the same word or phrase is used in the same section of an act more than once, and the meaning is clear as used in one place, it·will be construed to have the same meaning in the next place." *United States v. Nunez,* 573 F.2d 769, 771 (2d Cir.1978).

■ Congress used nearly identical language in defining the prerequisites to both class II and III gaming. *Compare* 25 U.S.C. § 2710(b)(1)(A) *with* 25 U.S.C. § 2710(d)(1)(B). Both classes are permissible on Indian lands if "located [within, § 2710(b)(1)(A), or in, § 2710(d)(1)(B),] a State that permits such gaming for any purpose by any person, organization or entity." Plaintiff points to the analysis underlying a pre-IGRA line of cases holding tribal bingo games to be lawful in states which permit but regulate charitable bingo. *See, e.g., Cabazon,* 480 U.S. 202, 107 S.Ct. 1083. The legislative history notes that the provisions regarding class II gaming, primarily bingo, were intended to be consistent with the tribal rights recognized in *Cabazon.* S.Rep. No. 100–446, 100th Cong., 2d Sess., *reprinted in* 1988 U.S. Code Cong. and Admin. News 3071, 3079.

In *Cabazon,* the Tribe operated public bingo games, as well as a card club, on its reservation. The State sought to bar Tribal bingo relying on a statute which permitted bingo only when conducted by a charitable organization and operated by its members on a voluntary basis, required that profits be segregated and used solely for charitable purposes, and imposed prize limits. The court applied a regulatory/pro-

hibitory analysis and held that tribes have a right to conduct gaming on Indian lands without state regulation if located in a state which permits, subject to regulation, the gaming. *Cabazon*, 480 U.S. at 209–10, 107 S.Ct. at 1088–89. The "shorthand test" was "whether the conduct at issue violates the State's public policy." *Id.* at 209, 107 S.Ct. at 1088. The court rejected California's contention "that high stakes, *unregulated* bingo, the conduct which attracts organized crime, is a misdemeanor in California and may be prohibited on Indian reservations" and held that tribes have a right to conduct gaming on Indian lands without state regulation if located in a state which regulates rather than prohibits the gaming in issue. *Id.* at 210–11, 107 S.Ct. at 1089.[4] In enacting IGRA, Congress anticipated "that Federal courts will rely on the distinction between State criminal laws which prohibit certain activities and the civil laws of a State which impose a regulatory scheme upon those activities to determine whether class II games are allowed[, i.e., located within a State which permits such gaming, § 2710(b)(1)(A) ] in certain States." S.Rep. No. 100–446, 100th Cong., 2d Sess., *reprinted in* 1988 U.S.Code Cong. and Admin.News 3071, 3076.

The State contends that Congress has restricted use of the *Cabazon* analysis to questions regarding class II gaming. It also contends that Congress has itself recognized that class III gaming was to be accorded substantially different treatment.[5] Although Congress did employ a different balance of federal, state, and tribal over-

sight with respect to class III gaming, both class II and III gaming are made contingent on a common requirement, i.e., location in a State that permits such gaming. That Congress used nearly identical language evidences an intent that the two be afforded the same construction. Accordingly, opinions construing the term "such gaming" in § 2710(b)(1)(A) can provide guidance in interpreting the same term in § 2710(d)(1)(B).

In *United States v. Sisseton–Wahpeton Sioux Tribe ("SWST")*, 897 F.2d 358 (8th Cir.1990), the question was whether a blackjack game operated by a tribe was lawful as located within a state permitting such gaming. The blackjack, which was permitted under state law, was subject to a $5 bet limit. The district court held that the tribe's blackjack game, which allowed bets of up to $100, was a different type of gaming than that statutorily permitted and thus did not satisfy the requirement that it be conducted in a state which permits such gaming. *Sisseton–Wahpeton Sioux Tribe ("SWST") v. United States*, 718 F.Supp. 755, 758 (D.S.D.1989). The district court noted that "if a non-Indian within a state can engage in the particular type of gaming venture, then an Indian tribe in that state may also pursue the same endeavor." *SWST*, 718 F.Supp. at 758. The eighth circuit reversed holding that "Congress intended that class II gaming be subject to tribal and federal oversight, and that the states' regulatory role be limited to overseeing class III gaming, pursuant to a Tribal–State compact." *SWST*, 897 F.2d at

---

**4.** In *Cabazon*, the state did not prohibit all forms of gambling and, in fact, encouraged its citizens to participate in a daily state-run lottery. "In light of the fact that California permits a substantial amount of gambling activity, including bingo, ... [the court] conclude[d] that California regulates rather than prohibits gambling in general and bingo in particular." 480 U.S. at 211, 107 S.Ct. at 1089.

**5.** The State also contends that the different prefatory language of the requirements with respect to class II and class III gaming must be considered in determining whether to apply similar statutory constructions. With respect to class II gaming, IGRA provides that "[a]n Indian tribe may engage in" class II gaming subject to two prerequisites. 25 U.S.C. § 2710(b)(1). The

State contends that this is a clear, affirmative grant of authority to the tribe to conduct such gaming, which contrasts decidedly with the prefatory language to the requirements for class III gaming which provides that such gaming "shall be lawful on Indian lands only if" certain preconditions are met. *Id.*, § 2710(d)(1).

While the prefatory language is distinct and must be considered, it does not provide, nor does there appear to be, a reason why the different prefatory language warrants different constructions of the identical "permits such gaming" requirement. The different prefatory language merely recognizes the additional requirement with respect to class III gaming that it is lawful only if conducted in accordance with a Tribal–State compact.

364. The court reasoned that permitting the State to apply its substantive law to class II gaming would conflict with IGRA's statutory scheme. *Id.*

Plaintiff here does not contend that it should be free to operate games of chance without State oversight. Rather it argues that any proposed games of chance on the reservation should not automatically be subject to all the restrictions imposed on Las Vegas nights by the state law but that IGRA requires the State to bargain with the Tribe over the scope of tribal gaming operations and the extent of State jurisdiction over such gaming.

In *SWST*, 897 F.2d at 364, the government argued that, with respect to either class II or III gaming, state law may supply substantive regulations on gaming. IGRA's requirement that the State permit such gaming was noted to be an "instance of Congress assimilating state law by reference." *Id.* Since the state's regulatory role with respect to class III gaming is limited to oversight pursuant to a Tribal–State compact, the court found application of state substantive law to conflict with IGRA's purpose. *Id.* The court rejected the state's argument on the basis that IGRA "contains no explicit abrogation of the right of tribes to conduct gaming without being subject to state regulation if the tribe is located in a state which regulates but does not prohibit gaming." *Id.* at 366.

The legislative history recites that "[t]he mechanism for facilitating the unusual relationship in which a tribe might affirmatively seek the extension of State jurisdiction and the application of state laws to activities conducted on Indian land is a tribal-State compact ... S.555 [does not] contemplate the extension of State jurisdiction or the application of State laws for any other purpose." S.Rep. No. 100–446, 100th Cong., 2d Sess., *reprinted in* 1988 U.S. Code Cong. and Admin.News 3071, 3075–76. "Even if a tribe engages in class III gaming pursuant to a compact with the State, it does not necessarily follow that the tribe is subject to the entire body of state law on gaming." *SWST*, 897 F.2d at 366 n. 10. IGRA contemplates compact negotiations regarding "the application of the criminal and civil laws and regulations of the Indian tribe or the State that are directly related to, and necessary for, the licensing and regulation of such activity." 25 U.S.C. § 2710(d)(3)(C)(i). Further, "state law on periods of operation is not necessarily imposed even upon class III gaming; rather, it is subject to negotiation." *SWST*, 897 F.2d at 367 n. 11; *see also* S.Rep. No. 100–446, 100th Cong., 2d Sess., *reprinted in* 1988 U.S.Code Cong. and Admin.News 3071, 3084 (compact negotiations may include agreements on days and hours of operation, wage and pot limits, types of wagers, and size and capacity of the proposed facility).

The determinative issue is whether Connecticut law governing "Las Vegas nights" is prohibitory, or merely regulatory. Section 7–186a(b), Conn.Gen.Stat., permits certain nonprofit organizations to operate games of chance for charitable purposes. The regulations list the permissible games to include blackjack, poker, dice, roulette, baccarat and other common casino games. Conn. Agencies Reg. § 7–186k–15. The nonprofit organization must have been in existence for two years and that the promotion and operation of the games must be conducted only by members of the group on a voluntary, nonrenumerative basis. Conn.Gen.Stat. § 7–186a(b). No persons under 18 may conduct, operate, or play such games and all funds derived must be used for the purposes of the sponsoring organization. *Id.* The state also imposes wager and prize limits: wagers cannot be made in money but only in chips or representations of money purchased for cash; a twenty-five dollar bet limit is imposed; winnings are only redeemable for prizes, merchandise, or goods, or for coupons or certificates for such merchandise or goods. Conn.Gen.Stat. § 7–186c(c). Criminal penalties are provided for violations—maximum $500 fine and/or 90 days for first offense; $1000 fine and/or one year for subsequent offenses. *Id.*, § 7–186*l*. The receipt of Las Vegas night proceeds, other than a fixed rental fee, by a dealer in gaming equipment is considered professional gambling. Conn.Gen.Stat. § 53–278a(3),

and prohibited by Conn.Gen.Stat. § 53–278b(b). Conn.Gen.Stat. § 7–186e.

The State argues that "Las Vegas nights" are not akin to commercial casino-type gambling which is not permitted in Connecticut. *See United States v. Dakota,* 796 F.2d 186, 189 n. 4 (6th Cir.1986) (recognizing distinction between commercial casino gambling and charitable "millionaire parties"). However, this argument would impermissibly subject plaintiff to the full extent of Las Vegas night regulation without negotiation. Games of chance are not prohibited in Connecticut. They are permitted but subject to extensive regulation and limitation. That a violation of the regulations may result in penal sanctions does not make them prohibitory. *See McGuigan,* 626 F.Supp. at 249.

The type of gaming permitted is identified by the type of play permitted, not by bet, frequency, and prize limits. The statute at issue in *Cabazon* permitted bingo only when conducted by a charitable organization subject to the limitations that profits be used solely for charitable purposes and prizes not exceed $250 per game. 480 U.S. at 205, 107 S.Ct. at 1086. Violation of these provisions constituted a misdemeanor. The tribes engaged in unregulated, high stakes bingo. Nonetheless, the state was held to have no authority to apply its bingo ordinances to tribal bingo because such gaming was regulated not prohibited. *Id.* at 210–11, 107 S.Ct. at 1089. Similarly, in *SWST,* 897 F.2d 358, the fact of a significantly higher bet limit than the law permitted was held not to make the tribe's blackjack game a different type of gambling for IGRA purposes than what was authorized by state law.

Connecticut permits games of chance, albeit in a highly regulated form. Thus, such gaming is not totally repugnant to the State's public policy. Connecticut permits other forms of gambling, such as a state-operated lottery, bingo, jai alai and other forms of pari-mutuel betting. High amounts may be bet and substantial winnings are permitted. Connecticut "regulates, rather than prohibits, gambling in general and [games of chance] in particular." *SWST,* 897 F.2d at 368. "[T]he legislative history reveals that Congress intended to permit a particular gaming activity, even if conducted in a manner inconsistent with state law, if the state law merely regulated, as opposed to completely barred, that particular gaming activity." *Id.* at 365. IGRA balances the Tribe's autonomy as a sovereign and the State's regulatory interest over gaming operations within its borders. These interests are accommodated by requiring negotiations aimed at a Tribal–State compact governing the conduct of class III gaming activities. *See* S.Rep. No. 100–446, 100th Cong., 2d Sess., 1988 U.S.Code Cong. and Admin.News 3071, 3083 ("[B]oth State and tribal governments have significant governmental interests in the conduct of class III gaming [and] are encouraged to conduct negotiations within the context of the mutual benefits that can flow to and from tribe and States.").

Accordingly, plaintiff's request for negotiation meets IGRA's requirement. The class III gaming which plaintiff wishes to conduct is "such gaming" as the state permits and is "located in a State that permits such gaming for any purpose by any person, organization, or entity." 25 U.S.C. § 2710(b)(1)(A). Plaintiff's motion for summary judgment on its second claim for relief is granted and defendants' cross-motion is denied.

Judgment shall enter for plaintiff:

1. Declaring that the State shall enter into good faith negotiations with the Tribe for the purpose of formulating a Tribal–State compact governing the conduct of games of chance defined in Conn.Gen.Stat. § 7–186a, *et seq.,* on its reservation.

2. Ordering that the State and the Tribe conclude a Tribal–State compact within sixty (60) days of this ruling. 25 U.S.C. § 2710(d)(7)(B)(iii).

SO ORDERED.