**ONEIDA TRIBE OF INDIANS OF WISCONSIN, A Federally Recognized Indian Tribe, Plaintiff,**

v.

**STATE OF WISCONSIN; Tommy G. Thompson, Individually and as Governor of the State of Wisconsin; and Donald J. Hanaway, Individually and as Attorney General of the State of Wisconsin, Defendants.**

No. 89–C–916–C.

United States District Court, W.D. Wisconsin.

July 17, 1990.

Francis R. Skenadore, Oneida, Wis., for plaintiff.

Warren Weinstein, Madison, Wis., for defendants.

## OPINION AND ORDER

CRABB, Chief Judge.

This is a civil action for injunctive and declaratory relief and monetary damages brought by plaintiff under the Indian Gaming Regulatory Act, 25 U.S.C. § 2701 *et seq.* Plaintiff alleges that defendants have failed to negotiate in good faith a compact governing the conduct of certain gaming activity on plaintiff's reservation. Jurisdiction is asserted under 25 U.S.C. § 2710 of the gaming act and 28 U.S.C. § 1362, the Indian federal question statute.

The case is before the court on cross motions for summary judgment on one aspect of the negotiations for a tribal-state compact as to which the parties have reached an impasse. Although plaintiff has alleged a lack of good faith by defen-dant in negotiating, plaintiff is not asking at this time to initiate the procedures provided under the Act when a showing of lack of good faith has been made, which include ordering the parties to conclude a compact within 60 days and the appointment of a mediator to select between the tribe's proposed compact and the state's. Rather, both parties have asked the court to determine whether certain games operated by the plaintiff tribe are within the Indian Gaming Regulatory Act's definition of class II or class III gaming.

For the reasons that follow, I conclude that the disputed games conducted by the plaintiff are within the Act's definition of class III games and therefore are lawful only when run in conformance with a tribal-state compact.

For the purpose of resolving their respective motions, the parties have entered into a stipulation of facts. From these facts, and solely for the purpose of deciding this motion, I find there is no genuine issue as to the following material facts.

## FACTS

Under the marketing name First American Games, plaintiff operates games of chance called "Big Green" and "Cash-3" on its reservation in Wisconsin. First American Games, Big Green and Cash-3 are conducted at the same location as the Oneida bingo games, that is, in the Irene Moore Activity Center on the reservation. However, players may participate from any one of thirteen terminals located throughout the reservation.

To play Big Green, a player selects six numbers between 1 and 36. The player indicates the numbers selected on a lotto play slip or allows the computer to generate the selection for her through the use of an E-Z Pick feature. The player must present the lotto play slip at an authorized First American Games lottery location. The player pays $1.00 for each play. A player may designate the same numbers for one to twenty consecutive drawings.

The player's election is entered either by manual entry via the terminal keyboard or

via the optical mark sense reader that scans the lotto play slip and records the player's numbers. The transaction is registered from a terminal at the reservation by telephone line to plaintiff's Gaming Data Center computer in the Irene Moore Activity Center.

The net sales for the week are the gross sales for the Big Green game less the tribe's operating expense and profit. The gross sales are divided among three prize pools as follows: The jackpot prize is 32.02% of gross sales; the second prize is 9.24% of gross sales; the third prize is 13.74% of gross sales. (The parties do not explain why third prize is larger than second; possibly it is because a greater percentage of persons win third prize.)

Each week plaintiff selects six numbers between 1 and 36. The selection is done through the use of a bingo ball blower using independently tested bingo balls that are pre-cleaned, measured and weighed. Extensive security procedures are in place to ensure game integrity.

Video recordings of each game are made and retained for game integrity. The bingo balls are secured by the Oneida Public Safety Department before and after each game.

Players whose six selected numbers exactly match plaintiff's six selected numbered balls win the jackpot prize. Players whose selected numbers match five of plaintiff's six numbered balls win the second prize. Players whose selected numbers match four of plaintiff's six numbered balls win the third prize.

The jackpot prize consists of the jackpot pool for the week. The initial jackpot is a $500,000, 20-year annuity. It escalates each week by a percentage of gross sales and continues until it is won, at which point the jackpot value starts over at the $500,-000 level. If more than one player wins the jackpot prize, second prize or third prize, the amount of the prize money in the prize pool is divided equally among the winners. Typically, the second and third prizes are won every week.

Except for the number selection matrix and prize structure, the operation of the Big Green game is identical to Lotto America/Megabucks, a lottery operated by the State of Wisconsin. Almost all states having a state lottery play this type of game, with the only variation being the range of numbers available to the players to select. For example, in Big Green players may select six numbers between 1 and 36. In Megabucks, players may select six numbers between 1 and 54. Other common ranges throughout the United States are 1 through 39 and 1 through 44.

Plaintiff also operates a game called "Cash–3." This game is similar to lottery games played by state lotteries variously called the "Daily Game" or "Pick–3." In Cash–3 the player selects three numbers between 0 and 9 and the player may bet either $.50 or $1.00. The player must place the bet with his selected numbers at any authorized First American Game lottery location. Plaintiff then selects three numbers between 0 and 9 each day.

The player wins a prize if he or she matches plaintiff's selected numbers as follows:

A. A $1.00 straight bet will pay $500.00. A $.50 straight bet will pay $250.00. A straight bet is a match of all three of the tribe's numbers in the exact order.

B. A $1.00 boxed bet on a number such as 123 (all three digits different) will win $83.00 because there are six ways to win: 123, 132, 312, 213, 231, 321. A $.50 box bet on a number like 123 will pay $41.00.

C. A $1.00 box bet on a number such as 559 (two of three digits the same) will pay $166.00 because there are three ways to win: 559, 595, 955. A $.50 bet on a similar number will pay $41.00.

D. A $1.00 2–Way bet on a number like 123 will pay either $41.00 or $291.00. A 2–Way bet is a match of either the first two or the second two of the tribe's numbers.

E. A $1.00 2–Way bet on a number like 559 will pay either $83.00 or $333.00.

The Cash–3 game is subject to the same strict controls as the Big Green game.

## OPINION

■ The threshold question is whether the parties' dispute constitutes a case or controversy over which this court has jurisdiction. The parties contend that the impasse in their bargaining for a tribal-state compact presents a justiciable dispute. Ordinarily, however, federal courts do not issue opinions advising negotiating parties of the meaning or effect of their proposed agreements. *See Barr v. Matteo*, 355 U.S. 171, 172, 78 S.Ct. 204, 205, 2 L.Ed.2d 179 (1957) ("[A]n advisory opinion cannot be extracted from a federal court by agreement of the parties....")

The parties assert that jurisdiction is present under 28 U.S.C. § 1362, the Indian federal question statute, in conjunction with 28 U.S.C. § 2201, the declaratory judgment statute. The assertion begs the question. Both statutes require the existence of a "controversy."

On its face, the Indian Gaming Regulatory Act does not provide a jurisdictional basis for plaintiff's suit. The Act gives the federal district courts jurisdiction over "any cause of action initiated by an Indian tribe arising from the failure of a State to enter into negotiations with the Indian tribe for the purpose of entering into a Tribal–State compact ...," or any cause of action brought by a state or Indian Tribe to enjoin a class III gaming activity on Indian lands that is conducted in violation of any tribal-state compact, and any cause of action initiated by the Secretary of the Interior to enforce the procedures imposed upon states that do not negotiate in good faith. The Act does not purport to give the district courts jurisdiction to render advisory opinions to parties who have disagreements about the meaning of a particular provision of the Act in the course of negotiating gaming compacts.

Despite my reluctance to reach a result in this case that sets a possible precedent for the federal courts' taking on a supervisory role over tribal and state negotiations of gaming compacts, I find that the particular circumstances of this case justify the exercise of jurisdiction over the parties' dispute.

It is a primary purpose of the Indian Gaming Regulatory Act to promote the creation of tribal-state compacts that regularize Indian gaming activity and resolve the troublesome questions of overlapping and conflicting law enforcement by state, federal, and tribal authorities of criminal violations of gaming laws on Indian lands. It would not advance this purpose for the courts to refuse to hear disputes over the scope and application of the provisions of the Act in the course of negotiations. Instead, the negotiating parties would be forced to declare the negotiations at an impasse so that the tribe could bring a bad faith action against the state under 25 U.S.C. § 2710(d)(7)(A). There is no point to require such a formality when both parties are actually negotiating in good faith, but are stalled on a legal question *and* that question is one of sufficient particularity and concern to the parties as to ensure they have the necessary stake in its resolution. Neither is it a desirable option for the tribe to go ahead with the activity and wait to raise the issue of the classification of the activity as a defense to a criminal proceeding. Prosecutions by the state would burden the state courts unfairly with issues of federal law; prosecutions by more than one court could lead to inconsistent results.

The critical consideration is that these parties have concrete stakes in the outcome of the litigation. Their concern is for more than an advisory opinion about a theoretical situation. The essence of a controversy is that the parties have a stake in the outcome sufficient to create an incentive to litigate vigorously and to illumine the particular aspects of their position. That requirement is met here. If, as plaintiff maintains, the games are class II activities, plaintiff can offer them to the public now without waiting for the completion of the negotiations and without fearing that it will be subject to criminal sanctions. On the other hand, if defendants are correct that the games are properly classified in class III, plaintiff will lose all of its income

from the games until and unless it can negotiate a tribal-state compact that permits the playing of such games.

In summary, the interest of the parties in the issues in question and the specificity of their disagreement support the parties' characterization of their dispute as a controversy over which this court has jurisdiction under 28 U.S.C. § 1362.

I turn then to the merits of the motion.

■ The issue is whether the games conducted by the plaintiff are class II or class III games within the meaning of the Indian Gaming Regulatory Act, 25 U.S.C. § 2701 *et seq.*, a comprehensive statutory scheme enacted to regulate the growing use of Indian gaming as a means of producing tribal income. Under the Act, gaming activities are divided into three categories. Class I includes social games played for prizes of minimal value or traditional Indian games related to tribal ceremonies. Section 2703(7)(A) defines "class II gaming" in pertinent part as follows:

(i) the game of chance commonly known as bingo (whether or not electronic, computer, or other technologic aids are used in connection therewith)—

(I) which is played for prizes, including monetary prizes, with cards bearing numbers or other designations,

(II) in which the holder of the card covers such numbers or designations when objects, similarly numbered or designated, are drawn or electronically determined, and

(III) in which the game is won by the first person covering a previously designated arrangement of numbers or designations on such cards,

including (if played in the same location) pull-tabs, lotto, punch boards, tip jars, instant bingo, and other games similar to bingo....

Section 2703(8) defines class III gaming as "all forms of gaming that are not class I or class II gaming."

Plaintiff contends that the games "Big Green" and "Cash–3" fall into class II and may be conducted without a tribal-state compact. Plaintiff argues that "lotto" is

well known to be a term used in connection with lotteries; the inclusion of the term in class II indicates that lotteries are intended to be covered by that classification. Defendants contend that "Big Green" and "Cash–3" are games wholly different in character from the bingo and bingo-like games included in Class II and are therefore placed properly into class III, in which they are lawful only when conducted in conformance with a tribal-state compact entered into by the tribe and the state. Defendants contend also that the games fall outside the class II category because they are not played at the same location as the bingo and bingo-like games, but from electronic terminals scattered around the reservation.

In resolving the parties' dispute, the court's duty is to effectuate congressional intent. The starting point in determining that intent is the language used. If that is ambiguous, it is appropriate to look to the legislative history. *Blum v. Stenson*, 465 U.S. 886, 896, 104 S.Ct. 1541, 1547, 79 L.Ed.2d 891 (1984).

Looking to the plain language of § 2703(7)(A), I find no indication that lottery-type games are included in the Class II definition. First, all of the games other than lotto that are referred to are either bingo or games similar to bingo, that is, games in which a board is used, numbers are called, and the first player with a winning sequence prevails.

Second, the dictionary definition of "lotto" is of a game similar to bingo. For example, Webster's defines lotto to be "a game played with cards bearing numbers, five in each line, the holder covering a number when it is called by one who draws numbered balls from a bag. The game is won by the player who first covers a line of numbers." *Webster's New International Dictionary* 1461 (2d ed. 1957). Random House defines it as "a game of chance in which a leader draws numbered disks at random from a stock and the players cover the corresponding numbers on their cards, the winner being the first to cover a complete row." *Random House Dictionary*

*Of The English Language* 1138 (2d ed. 1987).

Given the common dictionary definition of "lotto" and its placement in a provision otherwise limited to bingo and bingo-like games, I am satisfied that Congress intended § 2703(7)(A)(i) to be a narrow delineation of existing bingo games. To read "lotto" in this section as including games like "Big Green" and "Cash–3" would upset the Congressional scheme.

Plaintiff takes a different approach. It contends that the word "lotto" has come to be associated with large stake, state-run lotteries; that Congress was aware of this and indeed, many of its members objected to the proposed legislation for fear it would legalize lotteries on reservations that were illegal in the surrounding state; and that Congress chose not to include any limiting definition of lotto that would have precluded tribes from offering lottery-type games along with bingo. To avoid the concerns of its members, Congress included lotto in the provision restricting bingo-type activity to reservations to ensure that there would be no state-wide tribal lottery operating in states opposed to such lotteries. Plaintiff adds the argument that if there is any ambiguity about the congressional intent, traditional tenets of interpretation of federal law in favor of Indians tips the balance in favor of reading the statute to the tribe's benefit.

Although plaintiff's position has some merit to it, I conclude that the language and structure of the legislation and its legislative history lead to the opposite conclusion.

It is implausible to suppose that Congress intended to slip large stake lotteries into a provision that focuses solely on delineating the range of permissible *bingo* games and lists those games with features similar to the traditional bingo game. Plaintiff's argument is that Congress included lotteries within "lotto" by not defining lotto to exclude lotteries. It is far more likely that if Congress intended to include large stake lotteries within the term lotto as Class II games, it would have made the intention explicit. Lotteries are so important to many states as revenue producers and so much a subject of opposition by other states to whose citizens do not want lotteries within their borders, it is inconceivable Congress would have dealt with them only by implication.

Any possible ambiguity in the use of the word lotto in the definition of class II activity is resolved by a review of the legislative history. Comments by Senator Domenici during floor debate are indicative:

> I believe that there are other Senators who have questioned whether lotto and lotteries are interchangeable terms. This amendment makes it clear that they are not and that traditional type lottery games are indeed class III. As such, lotteries may only be conducted by a tribe if such games are otherwise legal in the State and if the tribe and the State have reached a compact to regulate such games.

134 Cong.Rec. S12,650 (1988). *See also* comments of Sen. Burdick to the effect that amendments to § 555 made it clear that tribes could not operate lotteries without a tribal-state compact. *Id.* at S12,655.

From the language and structure of § 2703(7)(A)(i) and from the legislative history of the Act, I conclude that there is no ambiguity about Congress's intent to classify games such as "Big Green" and "Cash–3" as class III games under the Indian Gaming Regulatory Act, and to make them lawful only when run in conformance with a tribal-state compact. Therefore, it is unnecessary to reach plaintiff's argument that ambiguities in federal Indian legislation be resolved in favor of the Indians, or to reach defendants' second ground for its contention that the Big Green and Cash–3 games do not fit the Class II definition because they are not played within the same location as plaintiff's bingo games.

## ORDER

IT IS ORDERED that defendants' motion for summary judgment is GRANTED. FURTHER, IT IS ORDERED that plain-

tiff's motion for summary judgment is DE-
NIED.