**SPOKANE TRIBE OF INDIANS,**
Plaintiff,

v.

**UNITED STATES of America,**
**et al., Defendants.**

**No. C–90–388–RJM.**

United States District Court,
E.D. Washington.

April 10, 1991.

Candy L. Jackson, Dellwo, Rudolf & Schroeder, Spokane, Wash., for plaintiff.

James R. Shively, Asst. U.S. Atty., Spokane, Wash., for defendants.

ORDER

ROBERT J. McNICHOLS, District Judge.

Currently pending are cross-motions for summary judgment. Argument was heard on April 8, 1991 at 2:30 p.m. The Tribe seeks declaratory relief that certain gaming devices maintained on the Spokane Reservation are exempt from state regulation and hence do not derivatively violate federal law. See 18 U.S.C. § 1166.

While the parties do not raise a jurisdictional issue, the court is obligated to do so sua sponte. *Kinsey v. Nestor Exploration Ltd.—1981A*, 604 F.Supp. 1365, 1368 (E.D.Wn.1985). It is elemental that a live controversy is a requisite to justiciability. *Oneida Tribe of Indians v. State of Wisconsin*, 742 F.Supp. 1033, 1036 (W.D.Wis.1990) and authorities cited therein. Neither criminal nor civil proceedings have as of yet been brought. In his letter to the Tribe dated August 22, 1990 U.S. Attorney John Lamp does not expressly threaten such action. It seems apparent from the tenor of that letter, however, that seizure of the devices is at least contemplated. The court thus concludes that the Tribe has an economic interest at sufficient actual risk to justify this action. See *Mashantucket Pequot Tribe v. State of Connecticut*, 737 F.Supp. 169, 172

(D.Conn.), *aff'd*, 913 F.2d 1024 (2nd Cir. 1990), *pet. for cert. pending.*

■ Known as "Pick 6 Lotto" the subject devices operate as follows. The player deposits money and a video screen displays one or more electronic "tickets" depending upon how much money is deposited. The player selects six numbers ranging from "1" to "45." The device then selects its own six numbers. Two or more matches will result in the player receiving "credits" which may be used to play additional games. A match of all six numbers may result in a significant number of credits depending upon the current level of the progressive jackpot. When the player tires of the game, the device prints the number of any remaining credits on a slip of paper which may then be converted into cash.

The core issue is whether the Tribe's lotto machines are Class II or Class III gaming devices within the meaning of the Indian Gaming Regulatory Act [IGRA] codified at 25 U.S.C. § 2701 *et seq.*. If the former, the regulation of such devices is solely a matter of federal and tribal law. If the latter, their possession is a crime under state law and thus indictable under federal law. *See generally, Mashantucket, supra,* 913 F.2d at 1025–26 (overview of IGRA); *United States v. Sisseton–Wahpeton Sioux Tribe,* 897 F.2d 358, 359–60 (8th Cir.1990) (same). The various classes are already defined by statute, although the Act confers some regulatory authority on the National Indian Gaming Commission. § 2706(b).

At the risk of oversimplifying the parties' respective positions, the government contends that because the lotto machine is electronically operated, it is per se carved out of Class II by operation of § 2703(7)(B)(ii) and is thus a prohibited Class III device under § 2703(8). The Tribe argues that electronic operation is only marginally relevant, and that the mere fact that a device employs advanced technology does not necessarily change the essential character of the underlying game. For example, an electronic pull tab machine which reveals a number upon pressing a button is no different in function than would be a manual pull tab where the number is revealed by peeling off the face of the tab. It is argued that a lawful pull tab should not be converted into an unlawful pull tab simply because the dispensing machine must be plugged into an electrical outlet.

Two eventualities may moot the issue, or at least render any decision this court might make a nullity. First, the Commission could act on the question in which case the courts would be required to show a measure of deference.[1] The parties no doubt have a feel for how quickly this might occur, if at all. Second, the State of Washington is engaged in negotiations with the Tribe with the goal of entering into a compact. § 2710(d). The compact could authorize what would otherwise be prohibited devices under state law. *Id.* Such authorization would also operate to render the devices lawful as a matter of federal law subject to the limitations of the Johnson Act, 15 U.S.C. §§ 1171 *et seq.* Again, the parties are probably aware of the progress of negotiations.[2] In the meantime, the issue is presently ripe for disposition and must be reached notwith-

1. The Commission could only implement the statute; not rewrite it. As will appear further, however, the central inquiry is what definition should attach to the term "lotto." An administrative determination of what lotto means would be entitled to weight so long as it did not contravene legislative intent.

2. Upon request from a tribe, a state is required to negotiate in good faith to achieve a compact. *Lac du Flambeau Band of Lake Superior v. State of Wisconsin,* 743 F.Supp. 645, 648 (W.D.Wis. 1990). A refusal to negotiate, or to do so in good faith, is subject to judicial review. *Id.* Presumably, Washington is taking the position that there are certain types of gambling activity

which no one is allowed to engage in. Where gambling is prohibited as a matter of public policy, a state need not allow such activity on Indian lands. This is not presently at issue, but undoubtedly will be at some future juncture. See *id.* at 651 ("Indeed, there is a strong argument to be made that when the electorate amended the constitution to allow a lottery, it eliminated any remaining constitutional prohibition against any form of gambling"). *Cf., Wash. St. Const.,* Art. II, § 24 (as amended). Prior to being amended in 1972, that section imposed a flat bar on all lotteries. Historically in Washington, the term "lottery" has been given a broad reading as encompassing all forms of activities which have as their elements prize,

standing that future developments may well produce a different result.

For present purposes, the court accepts both of the parties' legal arguments. It is a factual premise which is troublesome. In the abstract, the Tribe has the plain language of § 2703(7)(A) and legislative history on its side. The statute does in fact carve out lotto from the prohibition against electronic operation, and the legislative history does in fact recite that technology should be freely available so long as "the use of such technology does not change the fundamental characteristics of the bingo or lotto games." *S.Rep.No.* 100–466, *reprinted in* [1988] *U.S.Code Cong. & Admin.News* 3071, 3079.

In the abstract, the government has § 2703(7)(B)(ii) which could scarcely be more emphatic in excluding "electronic ... facsimiles of any game of chance" from Class II.[3] Why Congress would be prejudiced against electricity is not clear from the face of the statute. Presumably, games of chance powered by a windmill or a diesel engine would be acceptable. But the fact is that the words appear and the court cannot ignore them. *United States v. Schwartz*, 785 F.2d 673, 679 (9th Cir.), *cert. denied*, 479 U.S. 890, 107 S.Ct. 290, 93 L.Ed.2d 264 (1986).

While both parties advance sound positions when considered in the abstract, this is not an abstract case. Rather, it involves a tangible device which either is or is not a lotto game. That characterization is outcome determinative, for if a person can play lotto on the subject machine, the device is included within Class II:

The term "Class II gaming" means—

(i) The game of chance commonly known as bingo (*whether or not electronic, computer, or other technologic aids are used in connection therewith—*

(I) which is played for prizes, including monetary prizes, with cards bearing numbers or other designations,

(II) in which the holder of the card covers such numbers or designations when objects, similarly numbered or designated, are drawn or electronically determined, and

(III) in which the game is won by the first person covering a previously designated arrangement of numbers or designations on such cards,

including (if played in the same location) pull-tabs, lotto, punch boards, tip jars, instant bingo, *and other games similar to bingo.*

§ 2703(7)(A) (emphasis added).

On the other hand, if a person cannot play lotto on the device, the prohibition of § 2703(7)(B)(ii) finds full force. Some might view the statute as being in irreconcilable conflict and thus not amenable to the settled rule that every term in a statute is to be given effect; or at least not so amenable without resort to interpretive aids. Any perceived ambiguity disappears, however, upon realizing that congressional approval of employing modern technology in conjunction with gaming devices treats bingo-type games as a term of art. "Lotto" may mean many things to many people, given the proliferating use of the term in modern day parlance. When the State of Washington urges the public to "play lotto," only the avid aficionado who follows such things knows what game is being

---

chance and consideration. *State ex rel. Schillberg v. Safeway*, 75 Wash.2d 339, 345 *et seq.*, 450 P.2d 949 (1969). It appears that with the 1972 amendment, both the electorate and the legislative bodies of Washington no longer consider gambling per se inimical to the public interest. Thus, it may be argued that Washington merely regulates, and does not prohibit, all gambling. Frankly, the *Lac du Flambeau* analysis seems overbroad. There is no longer a constitutional bar in Washington to any gambling activity, but there are other sources of public policy besides the Constitution. In any event, the State is not a party to this action and the foregoing discussion is thus premature.

**3.** The government also argues that because an earlier version of the IGRA which would have positioned electronic bingo games in Class II was not adopted, that should be deemed evidence that Congress considered and rejected the possibility that such devices could ever be embraced within § 2703(7)(A). It seems a hazardous approach to infer what Congress did by looking at what it did not do. Principles of statutory construction are already fraught enough with pitfalls that the use of mirrors to reflect the true image should be a tool of last resort. In light of the disposition, there is no need to do so.

played this week. Dictionary definitions will doubtless have to be rewritten in the future.

At the time the IGRA was enacted in 1988, however, lotto had an established meaning. *Oneida, supra,* 742 F.Supp. at 1037–38 (surveying dictionary definitions). A review of the various dictionaries located in this court's chambers supports the *Oneida* rationale:

> [Lotto is] a game played with cards having squares numbered in rows, no two cards being numbered alike: counters are used to cover the numbered squares corresponding to the numbered disks drawn by lot from a bag or box and the player who first gets one row, etc. on his card covered is the winner: as a gambling game, usually called bingo.

*Webster's New World Dictionary* (2nd College Ed.).

Lotto has heretofore been a bingo-type game, notwithstanding that the term today has a broader meaning.[4] Indeed, Mr. Webster says that the term is synonymous with bingo. Congress is presumed to have been aware of that commonly understood definition, and to have intended that the term be given its ordinary meaning. *Brandes v. United States,* 783 F.2d 895, 896–97 (9th Cir.1986); *Schwartz, supra,* 785 F.2d at 679. Matching numbers against a computer is not "lotto" as that term is employed in the statute. *Oneida, supra,* 742 F.Supp. at 1037–38. Rather, this is an "electronic game of chance" which, under the doctrine of *ejusdem generis* does not fall within § 2703(7)(A), but § 2703(7)(B). Simply calling the device a lotto game does not make it so. To apply the nebulous definition of "lotto" currently in vogue would be to allow neological evolution to create or destroy penal law. That is a function vested exclusively in Congress.

Then too, it is interesting to note that plaintiff affirmatively argues that the device at issue is similar to the State's lottery system.[5] That seems a valid observation. In both cases, players match numbers against machines and whichever players are the luckiest, win. But the State's lottery system is just that—a lottery in the classic sense. It is not "lotto" as that word has been historically understood.

Were there room for statutory construction, reasonable minds could arrive at an array of conflicting conclusions. The prime sponsor of the bill, Senator Inouye, reads the legislation diametrically different than does Mr. Ott of the BIA.[6] In the face of an unambiguous statute, however, there is no room for construction. *Schwartz, supra,* 785 F.2d at 679. As the IGRA applies to the facts at bar, the court finds no ambiguity.

Even were the Act subject to interpretation, legislative history suggests that both allowing and prohibiting electronic technology was something Congress put some thought into:

> [T]he Committee intends ... that tribes have maximum flexibility to utilize games such as bingo and lotto for tribal development. The Committee specifically rejects any inference that tribes should restrict class II games to existing games sizes, levels of participation, or current technology. The Committee intends that tribes be given the opportunity to take advantage of modern methods of conducting class II games and the language regarding technology is designed to provide maximum flexibility. In this regard, the Committee recognizes

---

**4.** It does seem strange that Congress would draft a painstakingly precise definition of "bingo," a term that is universally understood, and yet make no effort to define "other games similar to bingo," some of which the uninitiated may have never heard of.

**5.** That comment was made in relation to a contention that the State cannot validly withhold consent to use devices which operate similarly to the Washington lottery in framing a compact. As mentioned at note 2, *supra,* that is not now a live issue.

**6.** Mr. Ott is the Area Director, Eastern Area Office, of the Bureau of Indian Affairs. On January 11, 1991 he framed an opinion letter which held that a device similar to the one at issue fell into Class II. That opinion letter has subsequently been withdrawn upon direction from his superiors. The court places no weight on the now-withdrawn opinion. Nor is weight placed on Senator Inouye's private communications.

that tribes may wish to join with other tribes to coordinate their class II operations and thereby enhance the potential of increasing revenues. For example, linking participant players at various reservations whether in the same or different States, by means of telephone, cable, television or satellite may be a reasonable approach for tribes to take. Simultaneous games participation between and among reservations can be made practical by use of computers and telecommunications technology *as long as the use of such technology does not change the fundamental characteristics of the bingo or lotto games* and as long as such games are operated in accordance with applicable Federal communications law. In other words, *such technology would merely broaden the potential participation levels and is readily distinguishable from the use of electronic facsimiles in which a single participant plays a game with or against a machine rather than with or against other players.*

S.Rep.No. 100–466, *supra, reprinted in* [1988] *U.S.Code Cong. & Admin.News* 3071, 3079 (emphasis added).

It is apparent that congressional endorsement of technology was confined to those applications which enhance communications with the announced goal of broadening participation levels. There is no reason to believe Congress intended that what is obviously an "electronic game of chance" be legitimated by the mere expediency of calling it a lotto device. It is true that the Committee's attempt at rationalization is not altogether satisfying, but were the device at issue deemed Class II, there would be no limit to creative applications. Embracing plaintiff's position would lead to the result that any time a player's success rested on his ability to predict what a machine might do, the device would be authorized, and the prohibition of § 2703(7)(B)(ii) would effectively be eliminated.

Because of the mode of disposition, there is no need to reach the question of whether the Tribe's multiple devices situated at different sites satisfies the statutory requirement that "other games similar to bingo" are authorized only "if played in the same location" as the bingo games. § 2703(7)(A). It is doubtful that Congress intended that "location" be coextensive with the boundaries of a reservation, although the statute is not a model of clarity in this regard.

The Tribe focuses heavily on policy considerations. A fundamental purpose of the IGRA was to promote tribal sovereignty by providing a source of revenue. §§ 2701(1) & 2702(1); *Sisseton–Wahpeton, supra,* 897 F.2d at 359. The subject games involve small stakes, do not significantly interfere with the Washington State lottery, and provide much needed funds for tribal operations. These are all legitimate concerns, but should be the subject of compact negotiations, or addressed to Congress, or to the extent it has authority to act, the Commission.

THEREFORE IT IS ORDERED that:

(1) Plaintiff's motion for summary judgment is DENIED.

(2) Defendant's motion for summary judgment is GRANTED.

(3) The action is DISMISSED.

(4) The Clerk shall enter judgment accordingly.