**YAVAPAI–PRESCOTT INDIAN TRIBE, a federally-recognized Indian Tribe, Plaintiff,**

White Mountain Apache Tribe; Cocopah Indian Tribe; Pascua Yaqui Indian Tribe; and Tohono O'Odham Nation, Plaintiffs/Intervenors,

v.

**STATE OF ARIZONA, and J. Fife Symington, III, Governor of the State of Arizona, and Grant Woods, Attorney General of the State of Arizona, Defendants.**

**No. Civ. 91–1696 PCT PGR.**

United States District Court,
D. Arizona.

May 28, 1992.

David F. Gaona and Luis A. Ochoa, Phoenix, Ariz., for plaintiff.

Katherine L. Mead, Asst. Atty. Gen., Phoenix, Ariz., for defendants.

## MEMORANDUM AND ORDER

ROSENBLATT, District Judge.

### INTRODUCTION

This is an action by the Yavapai–Prescott Indian Tribe (hereinafter "plaintiff" or the "Tribe") against the State of Arizona, its Governor and its Attorney General (hereinafter "defendants" or the "State") for declaratory relief, seeking enforcement of the Indian Gaming Regulatory Act, 25 U.S.C. §§ 2701, *et seq.* This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1362 and 25 U.S.C. § 2710(d)(7)(A)(i).[1]

---

**1.** 25 U.S.C. § 2710(d)(7)(A)(i) provides, in pertinent part, that the United States district courts shall have jurisdiction over any cause of action initiated by an Indian tribe arising from the

Pending before the Court is plaintiff Yavapai–Prescott Indian Tribe's motion for summary judgment. Pursuant to a stipulation between plaintiff and defendants, plaintiff seeks the Court's resolution of one question: the scope of class III gaming allowable in Arizona and the State's duty to include various forms of class III gaming activity in a Tribal–State compact.[2]

The Court has determined, however, for the reasons that follow, that resolution of this question by this Court, at this time, is not contemplated by IGRA.

## THE INDIAN GAMING REGULATORY ACT

The Indian Gaming Regulatory Act, 25 U.S.C. §§ 2701 *et seq.* ("IGRA"), reflects several years of discussions among Indian tribes, states, the gaming industry, the administration, and the Congress. S.Rep. No. 446, 100th Cong., 2d Sess. 10 (1988), *reprinted in* 1988 U.S.C.C.A.N. 3071, 3080.

In enacting IGRA, Congress decided there would be gaming on Indian lands. It clearly declared its purpose in the Act itself:

to set the statutory basis for the operation of gaming by Indian tribes as a means of promoting tribal economic development, self-sufficiency, and strong tribal government. 25 U.S.C. § 2702(1).[3]

Congress further intended IGRA to prevent the infiltration of organized crime and other corrupting influences, to assure that gaming on Indian lands is conducted fairly and honestly, and to establish federal authority and standards over gaming. 25 U.S.C. § 2702(2)–(3). *See also U.S. v.*

*Sisseton–Wahpeton Sioux Tribe*, 897 F.2d 358, 359 (8th Cir.1990).

IGRA creates a three-tiered classification of gaming activity that may be conducted on Indian land. Class I gaming is limited to traditional games associated with ceremonials and social games solely for prizes of minimal value. 25 U.S.C. § 2703(6).[4] Such gaming is within the exclusive jurisdiction of the tribes. § 2710(a)(1).

Class II gaming includes bingo, lotto, related games, and nonbanking card games. § 2703(7)(A). IGRA expressly excludes from class II banking card games, electronic or electromechanical facsimiles of any game of chance, and slot machines. § 2703(7)(B). An Indian tribe may engage in, or license and regulate, class II gaming if it is located within a State that permits such gaming. §§ 2710(b)(1)(A)–(B); *Sisseton–Wahpeton*, 897 F.2d at 360. Class II gaming is within the jurisdiction of the Indian tribes, but is subject to oversight by the National Indian Gaming Commission ("NIGC"). §§ 2703(7)(A), 2710(a)(2), (b) and (c); *U.S. v. Cook*, 922 F.2d 1026, 1033 (2nd Cir.1991).

Class III gaming includes all forms of gaming that are not within the class I gaming or class II gaming classifications, *i.e.*, banking card games, all slot machines, casinos, horse and dog racing, jai-alai, etc. § 2703(8); S.Rep. No. 446 at 7, 1988 U.S.C.C.A.N. 3077.

Class III gaming activities are lawful only if they are (a) authorized by a proper tribal ordinance or resolution approved by the Chairman,[5] (b) located in a State that

---

failure of a State to enter into negotiations with the Indian tribe for the purpose of entering into a Tribal–State compact ... or to conduct such negotiations in good faith.

2. Plaintiff's complaint alleged that defendants did not respond to its negotiation request in good faith, an allegation arguably necessary to initiating and maintaining a cause of action in this court. *See* 25 U.S.C. § 2710(d)(7)(A)–(B). Several courts, however, facing similar circumstances, have impliedly ruled that jurisdiction is not lost as a result of such a stipulation. *See, e.g., Oneida Tribe of Indians v. State of Wis.*, 742 F.Supp. 1033, 1034 (W.D.Wis.1990).

3. It is unfortunate that economic salvation on Indian lands rests on the ability to conduct gaming, with all of its attendant problems, when other economic development opportunities should be the focus. *See* S.Rep. 446 at 34, 1988 U.S.C.C.A.N. 3104 (additional views of Senator John McCain).

4. Unless otherwise noted, all statutory cites hereinafter shall refer to 25 U.S.C.

5. The term "Chairman" means the Chairman of the National Indian Gaming Commission, a commission given regulatory powers over various aspects of tribal gaming. §§ 2703, 2704. *See also* S.Rep. 446 at 7, 1988 U.S.C.C.A.N. 3077, *et seq.*

permits such gaming for any purpose by any person, organization, or entity, and (c) conducted in conformance with a Tribal–State compact entered into by the Indian tribe and the State pursuant to 25 U.S.C. § 2710(d)(3).[6] If a tribe wishes to conduct class III gaming, it must first enter into a compact with the State governing the conduct of gaming activities within the State in which the gaming will be located. *Id.*

## FACTS

The Tribe is a formally organized and federally recognized Indian Tribe which occupies a reservation within the State of Arizona. In November of 1988, the Tribe requested that the State enter into negotiations for the formation of a Tribal–State compact covering class III gaming. Negotiations commenced, leading to the parties' exchange of proposed compacts, and a meeting in October 1989 to discuss the various draft documents. At some point, the Tribe formally passed an ordinance authorizing gaming activities within the reservation.

Subsequent to October 1989, negotiations stalled. The parties have stipulated that negotiations between them reached an impasse due solely to a dispute as to the scope of class III gaming allowable in Arizona and the State's duty to include various forms of class III gaming activity in a Tribal–State compact. In particular, the parties disputed whether the State must include casino and video gaming in a Tribal–State compact.[7]

On October 23, 1991, plaintiff filed this action, and shortly thereafter filed its motion for summary judgment. After filing of plaintiff's motion, additional Indian tribes ("Intervenors") sought to intervene in the action. On February 24, 1992, the Court granted the Intervenors' motion as to those tribes authorized to initiate a court action under IGRA.

In response to the filing of the Intervenors' Complaint In Intervention, defendants filed a motion to dismiss on Tenth Amendment grounds. Intervenors have filed a motion for partial summary judgment which largely addresses those issues raised in plaintiff's motion for summary judgment.

Plaintiff seeks an order from this Court declaring that electronic or electromechanical facsimiles of any game of chance are games which are permitted in the State of Arizona by any person for any purpose, within the meaning of the Indian Gaming Regulatory Act, 25 U.S.C. § 2710(d)(1)(B). The parties agree that the video gaming[8] at issue falls within class III.

## DISCUSSION

### A. *The Parties' Dispute As to the Scope of Gaming Permitted Within Class III*

■ The parties' dispute centers on the scope of gaming permitted within class III of IGRA. Plaintiff argues that IGRA permits any type of class III gaming so long as the State allows it for any purpose, including charitable, commercial, or governmental purposes. In making this argument, Plaintiff relies upon 25 U.S.C. § 2710(d)(1), which states that "[c]lass III gaming activities shall be lawful on Indian lands only if such activities are ... located in a State that permits such gaming for any purpose by any person, organization, or entity." In construing this language, plaintiff further relies upon *California v. Cabazon Band of Mission Indians*, 480 U.S. 202, 107 S.Ct. 1083, 94 L.Ed.2d 244 (1987).

In *California v. Cabazon, supra*, the Court upheld the right of a tribe to conduct public bingo games on Indian lands by ap-

---

**6.** 25 U.S.C. § 2710(d)(3) sets forth the procedures to be followed in entering into a Tribal–State compact, and suggests compact topics.

**7.** The parties' January 31, 1992, stipulation indicated that they disputed "whether the State must include casino and video gaming in a tribal-state compact." Stipulation, p. 2. Plaintiff's Complaint and its Motion for Summary Judg-

ment requested judgment only as to electronic or electromechanical facsimiles of games of chance (video gaming). Complaint, p. 8; MSJ, p. 2.

**8.** The term "video gaming" is used as shorthand for electronic or electromechanical facsimiles of any game of chance.

plying a previously-established civil/regulatory-criminal/prohibitory analysis. Under this analysis, the court distinguishes between state laws prohibiting certain activities and state laws which impose a regulatory scheme upon those activities. Those activities which are merely regulated ("civil") as opposed to completely barred ("criminal"), may be conducted by the Tribe. *Cabazon*, 107 S.Ct. at 1088–89. *See also Mashantucket Pequot Tribe v. State of Conn.*, 913 F.2d 1024, 1029–32 (2nd Cir. 1990), *cert. denied*, —— U.S. ——, 111 S.Ct. 1620, 113 L.Ed.2d 717 (1991); *United States v. Sisseton–Wahpeton Sioux Tribe*, 897 F.2d 358, 365 (8th Cir.1990).

*Cabazon* was based upon an analysis of Public Law 83–280[9]. Congress, however, specifically considered *Cabazon* in drafting IGRA and approved Federal court reliance upon the distinction between State criminal laws prohibiting certain activities and State civil laws imposing "a regulatory scheme upon those activities to determine whether class II games are allowed in certain States." S.Rep. No. 446 at 6, 1988 U.S.C.C.A.N. 3076.[10] *See also* S.Rep. No. 446 at 2–6.

The State concedes that the *Cabazon* analysis must be applied to class II gaming disputes. The State contends, however, that Congress did not intend wholesale application of *Cabazon* to class III gaming. As the State points out, the Senate Report states:

> Under Public Law 83–280, the prohibitory/regulatory distinction is used to determine the extent to which State laws apply through the assertion of State court jurisdiction on Indian lands in Public Law 280 States. The Committee wishes to make clear that, under S. 555 [IGRA], application of the prohibitory/regulatory distinction is markedly different from the application of the distinction in the context of Public Law 83–280. Here, the courts will consider the distinction between a State's civil and criminal laws to determine whether a body of law is applicable, as a matter of Federal law, to either allow or prohibit certain activities. The Committee does not intend for S. 555 to be used in any way to subject Indian tribes or their members who engage in class II games to the criminal jurisdiction of States in which criminal laws prohibit class II games.

S.Rep. No. 446 at 6, 1988 U.S.C.C.A.N. 3076. *See also* § 2701(5), § 2710(d)(1)(A)–(C). Defendants argue that the Tribe's proposed use of video gaming is, "as a matter of criminal law and public policy," prohibited under the State's criminal statutes, and thus not subject to a Tribal–State compact.

A few courts have concluded that *Cabazon*'s civil/regulatory-criminal/prohibitory test also applies to class III gaming. *See Mashantucket Pequot Tribe v. State of Conn.*, 913 F.2d 1024, 1030–31 (2nd Cir. 1990), *cert. denied*, —— U.S. ——, 111 S.Ct. 1620, 113 L.Ed.2d 717 (1991); *Lac du Flambeau Indians v. State of Wis.*, 770 F.Supp. 480 (W.D.Wis.1991), *appeal dismissed*, 957 F.2d 515 (7th Cir.1992).[11] In *Mashantucket Pequot Tribe v. State of Conn.*, 913 F.2d 1024 (2nd Cir.1990), *cert. denied*, —— U.S. ——, 111 S.Ct. 1620, 113 L.Ed.2d 717 (1991), the Court, in attempting to resolve the State of Connecticut's

---

**9.** Public Law 83–280, codified in 18 U.S.C. 1162 and 28 U.S.C. 1360, granted six states (Alaska, California, Minnesota, Nebraska, Oregon and Wisconsin) general criminal and civil (but not regulatory) jurisdiction over Indians and Indian lands. *U.S. v. Cook*, 922 F.2d at 1035. *See also* S.Rep. No. 446 at 2, n. 1, 1988 U.S.C.C.A.N. 3072, n. 1; *Keetoowah Indians v. State of Okl. ex rel. Moss*, 927 F.2d 1170, 1178 n. 17 (10th Cir.1991).

**10.** The Ninth Circuit has applied the civil/regulatory-criminal/prohibitory test outside the context of Public Law 280 cases. *See, e.g., Barona Group of Capitan Grande Band of Mission Indians v. Duffy*, 694 F.2d 1185 (9th Cir.1982) (ap-

plying the test to OCCA cases), *cert. denied*, 461 U.S. 929, 103 S.Ct. 2091, 77 L.Ed.2d 301 (1983); *United States v. Marcyes*, 557 F.2d 1361 (1977) (applying the test to the Assimilative Crimes Act, 18 U.S.C. § 13). *See also Keetowah Indians v. State of Okl. ex rel. Moss*, 927 F.2d 1170, 1176, n. 13 (10th Cir.1991).

**11.** The State of Wisconsin's appeal, due to the State's failure to comply with Rule 4(a)(4) of the Federal Rules of Appellate Procedure, was consigned to "the graveyard of an inordinate number of appeals." *See Lac du Flambeau Indians v. State of Wis.*, 957 F.2d 515, 516 (7th Cir.1992).

claims that it was not obligated to negotiate as to certain types of gaming, decided that the civil/regulatory-criminal/prohibitory test applied to class III gaming. It then proceeded to fully examine application of *Cabazon* to the disputed games, and determined that the State was obligated to negotiate with the Tribe "concerning the conduct of casino-type games of chance." *Mashantucket*, 913 F.2d at 1032.

*Mashantucket, supra,* made a rule it did not have to make, but the case is applicable to this case to the extent that it suggests what types of gaming the parties should be negotiating. Whether Arizona law concerning any particular forms of gaming, including video games, are civil/regulatory or criminal/prohibitory is not the issue for the purpose of good faith negotiating. The negotiations are unlimited but are to be conducted according to Federal law, not State law. S.Rep. No. 446 at 6, 1988 U.S.C.C.A.N. 3076. The *Mashantucket* court properly did not limit the extent and left open the results of the negotiations. *Mashantucket*, 913 F.2d at 1032.

In *Lac du Flambeau Indians v. State of Wis.*, 770 F.Supp. 480 (W.D.Wis.1991), as in this case, the parties stipulated that the question of good faith was not before the Court. The Court then ordered the State to *conclude* a compact including activities defined by the *Cabazon* test. *Lac du Flambeau*, 770 F.Supp. at 488.[12] The ruling missed the mark and went too far. Good faith was not an issue, but the court nonetheless ordered the State to *conclude* a class III gaming compact which it could order only if the State failed to negotiate in good faith. § 2710(d)(2)(B)(iii).[13]

In spite of the parties' urgings, and other courts' activities, it is not for this Court to decide, at this time, the question presented, that is, whether video gaming must be negotiated as an allowable form of gaming because the State permits some types of gaming. The procedural framework established by Congress is intended to address the complicated and diverse tribal, state, and federal interests at issue here. Congress contemplated that, if the procedures were fully exhausted, these varied interests would be met and resolved to the extent possible.

Even though tribes and states might disagree as to what the Tribal–State compact should contain, the negotiation process might facilitate the elimination of some areas of disagreement between them as to what forms of and under what conditions Class III gaming could be conducted under a compact.

**B.  *Interests In Negotiating***

■ IGRA gives States the unique opportunity to participate in the regulation of class III gaming on Indian lands. *See* S.Rep. No. 446 at 13–14, 1988 U.S.C.C.A.N. 3083–84. *See also* § 2710(d)(3)(C)(i)–(vii). A state may reap this windfall simply by negotiating a Tribal–State compact with a tribe.

Congress strongly encourages states and tribes to negotiate for the mutual benefits that can flow to and from each other. S.Rep. No. 446 at 13, 1988 U.S.C.C.A.N. 3083. As Congress recognized, both parties have an interest in the negotiation of a Tribal–State compact. *Id.*

As to the Tribe's interests in negotiating a compact, these include "raising revenues to provide governmental services ..., promoting public safety as well as law and order on tribal lands, realizing the objectives of economic self-sufficiency and Indian self-determination, and regulating activities of persons within its jurisdictional borders." S.Rep. No. 446 at 13, 1988 U.S.C.C.A.N. 3083. The Court has considered additional incentives:

1.  Without a compact, the Tribe may not conduct class III gaming until such time as the Secretary of the Interior prescribes procedures pursuant to

---

**12.**  Wisconsin is a Public Law 83–280 State.

**13.**  One district court within this Circuit has stated that, "[f]rankly, the *Lac du Flambeau* analysis seems overbroad.... [T]here are other sources of public policy besides [Washington State's] Constitution." *Spokane Tribe of Indians v. U.S.,* 782 F.Supp. 520, 522, n. 2 (E.D.Wash. 1991). This is not, however, the basis for this Court's ruling.

2710(d)(7)(B)(vii)(I)–(II). If that should be necessary, it is entirely possible that the Tribe will have to bear the financial burden of regulation, including the establishment of a regulatory infrastructure. If the State provides the regulation, the expense to the Tribe will be significantly lower. Either way, regulation expense will be a cost of doing business affecting the Tribe's resulting profit margin; and

2. If gaming is such an economic panacea, the State's public policy may change. The State could legalize gaming, compete for the gaming dollar, and make it unnecessary or less attractive for non-Indians to go to tribal facilities.

As to the State's interests in negotiating a compact, these include the unique opportunity for examination and input as to the interplay of Indian gaming "with the State's public policy, safety, law and other interests, as well as impacts on the State's regulatory system, including its economic interest in raising revenue for its citizens." S.Rep. No. 446 at 13, 1988 U.S.C.C.A.N. 3083. There are additional incentives:

1. A compact would confine class III gaming to tribal lands while not interfering with existing public policy, and other considerations, on non-Indian lands;

2. Submitting a proposed compact, even if not accepted by the mediator or consented to by the State, helps set the parameters of regulation ultimately established by the Secretary; and

3. The very process of negotiation establishes a working relationship with the Tribe which undoubtedly will prove beneficial in all areas of mutual concern. *See also* S.Rep. No. 446 at 13, 1988 U.S.C.C.A.N. 3083.

If IGRA attempted to force the State to regulate by compact all gaming activities on tribal lands it might indeed run afoul of the Tenth Amendment. But Congress clearly was cognizant of the Tenth Amendment when it acknowledged that a State need not forgo any State governmental rights to engage in or regulate class III gaming except whatever it may voluntarily cede to a tribe under a compact. S.Rep. No. 446 at 14, 1988 U.S.C.C.A.N. 3084.

IGRA's terms do not force the State to enter into a compact, it only demands good faith negotiation in order to meet state, as well as tribal and federal, interests. *See id.;* § 2710(d)(3)(A); § 2710(d)(7)(A)-(B).

## C. *Procedures Prescribed by IGRA*

IGRA establishes a straightforward procedure for entering into a Tribal–State compact. Upon request by the Tribe, the state is to negotiate with the tribe in good faith to enter into such a compact. § 2710(d)(3)(A). If, after negotiation, the parties do not agree upon a compact within the time limits imposed, they shall submit to a mediator appointed by the Court their last, best offers for a compact. The mediator shall select from the two the one compact that best comports with the terms of IGRA and any other applicable Federal law and with the findings and order of the Court. § 2710(d)(7)(B)(iv).

The compact selected then is submitted to the State and the Tribe. § 2710(d)(7)(B)(v). The State may then consent to the proposed compact or not. If it does not, class III gaming may be conducted on the tribal lands under the procedures prescribed by the Secretary of the Interior which are consistent with the mediator-selected compact, the provisions of IGRA, and the relevant provisions of the laws of the State. § 2710(d)(7)(B)(vii).

If the State declines to accept the compact chosen by the mediator, that is the end of the matter insofar as state participation is concerned. The Tribe can then conduct class III gaming upon action by the Secretary, but only under tribal and federal regulation.

While the legislative history contained within Senate Report No. 446 and IGRA itself do not contemplate class III gaming in the absence of a Tribal–State compact, the law ultimately provides just such a result. Class III gaming may be conducted on Indian lands under procedures prescribed by the Secretary of the Interior. § 2710(d)(7)(B)(vii). It is at this stage that *Cabazon* will undoubtedly be the applicable test for permissible class III gaming activi-

ties, because the civil/regulatory-criminal/prohibitory test is the judicial test in the analysis of allegedly unlawful activities on tribal lands.

Thus, Class III gaming will be conducted on tribal lands. The only question is whether the gaming is conducted under a Tribal–State compact with state regulation, or under procedures prescribed by the Secretary.

After the proposed compacts are submitted to the mediator and he makes his selection, the State has an opportunity to consent. Perhaps by legislation, if existing authority is not adequate, the State would decide that its public policy is best served by overseeing gaming on tribal lands rather than permitting such activities on state lands. The public interest, public safety, criminality, etc. would best be served by agreeing to gaming on tribal lands.

The framework of IGRA is not merely a procedure to make the Tribe and the State jump through hoops because they have a different interpretation of the limitations of the gaming enactment, rather it provides the opportunity to serve each other's needs and in one small way address the age-old dilemma, the conflicting problems of state, tribal and federal jurisdiction that have been but cannot be deferred forever.

## CONCLUSION

Many anticipated the dawning of a new day with respect to the regulation of Indian gaming, "heralded by congressional enactment of the Indian Gaming Regulatory Act, 102 Stat. 2467 (1988) codified at 25 U.S.C. §§ 2701–2721 and 18 U.S.C. §§ 1166–1168 (1988) ("IGRA")." *See Keetowah Indians v. State of Okl. ex rel. Moss,* 927 F.2d 1170, 1176 (10th Cir.1991). That new day, however, has been clouded by many disputes concerning the interpretation and application of IGRA. In Arizona, as in other States, these disputes have engendered storms of controversy.

Nevertheless, while arguably imperfect, IGRA does provide a logical scheme for reconciling the many warring interests at stake, a scheme which must be followed to accomplish IGRA's important goals.

## ORDER

For the reasons set forth above, the plaintiff's Motion for Summary Judgment is granted in part and denied in part. Plaintiff's Motion is granted to the extent that the parties shall resume negotiations and attempt to conclude a Tribal–State compact within sixty days from the date of this Order. Plaintiff's Motion is denied to the extent that it seeks to have the *Cabazon* test applied to the scope of the negotiations and seeks a declaration from the Court that the State must conclude a compact including video gaming.

IT IS FURTHER ORDERED that in the event a compact is not concluded within fifty days from the date of this Order, the parties shall so advise the Court. In the event a compact is not concluded within sixty days, the parties will each submit on the sixtieth day to a mediator appointed by the Court a proposed compact that represents their last best offer for a compact.